CONNORS STEEL COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

Court No. 80-3-00478.

United States Court of International Trade.

Nov. 24, 1981.

Harris, Berg & Creskoff, Washington, D. C. (R. Christian Berg, Washington, D. C., on brief), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Branch Director, Commercial Litigation Branch, New York City (Velta A. Melnbrencis, on brief), for defendant.

Graubard Moskovitz, McGoldrick, Dannet & Horowitz, New York City (Michael H. Greenberg and Charles L. Rosenzweig, New York City, on brief), for amicus curiae Cockerill-Sambre, S. A., and Cockerill-Stinnes Steel Corp.

WATSON, Judge:

The plaintiff, Connors Steel Corporation (Connors), brought this action under 19 U.S.C. § 1516(d) (1976) to contest a final determination made by the Secretary of the Treasury in September of 1979 [1] that certain steel I-beams from Belgium were *not* being sold here at less than fair value. That determination ended an investigation under the Antidumping Act of 1921, as

___

[1] 44 Fed.Reg. 54579–81. Under the statute, the investigation of whether the sales were at less than fair value had two stages, a tentative determination (which normally had to be made within six months) and a final determination within three months thereafter. In this pro-ceeding, the tentative determination was made in four months and the final determination followed three months later. At both stages, the Secretary of the Treasury concluded that sales were not being made at less than fair value.

amended, 19 U.S.C. § 160, et seq., (1976). The investigation had begun in February of 1979, following a petition by Connors alleging that importations of steel beams were being sold in the United States at less than fair value and were causing injury to a United States industry. The subject of the petition and the investigation were steel I-beams manufactured in Belgium by Cockerill-Ougree-Providence et Esperance-Longdoy, S.A. (now Cockerill-Sambre, S.A.).[2]

The matter is now before the Court for decision on cross motions for judgment on the administrative record under Rule 56.1 of the Rules of the Court. An *amicus curiae* brief has been filed by the manufacturer of the beams, Cockerill-Sambre S.A. (Cockerill) and the importer, Cockerill-Stinnes Steel Corporation (CSSC).

The investigation of whether this class of articles was being sold here at less than fair value was the first part of the process of determining whether antidumping duties should be assessed. If sales at less than fair value had been found, the matter would have gone to the International Trade Commission for a determination of whether the relevant industry had been injured. 19 U.S.C. § 160(a) (1976).[3]

The Secretary's conclusion was based on a finding that the sale price to the United States was not less than the price in the Belgian home market for home consumption. Reference to the home market sales in Belgium for vindication of the fairness of the sale price to the United States was based on the following sequence of provisions in the statute: 19 U.S.C. § 160(c)(1) (1976)[4] mandated an investigation of whether the sales to the United States were at less than fair value. 19 U.S.C. § 160(b)(1)(A) (1976)[5] stated the obligation to determine whether the price was less than foreign market value. This in turn led to 19 U.S.C. § 164(a) (1976)[6] which, broadly

---

**2.** The beams were identified as hot-rolled steel I-beams, with symmetrical flanges or with one or more flanges offset, less than six inches in height and weighing not over 4½ pounds per linear foot. They were further identified as being provided for under Item 609.80 of the Tariff Schedules of the United States.

**3.** § 160. *Foreign merchandise sold or likely to be sold at less than fair value*
(a) Whenever the Secretary of the Treasury (hereinafter called the "Secretary") determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States or elsewhere at less than its fair value, he shall so advise the United States International Trade Commission (hereinafter called the "Commission") and the Commission shall determine within three months thereafter whether an industry in the United States is being or is likely to be injured, or is prevented from being established, by reason of the importation of such merchandise into the United States. The Commission, after such investigation as it deems necessary, shall notify the Secretary of its determination, and, if that determination is in the affirmative, the Secretary shall make public a notice (hereinafter in sections 160 to 171 of this title called a "finding") of his determination and the determination of the Commission.

**4.** (c)(1) The Secretary shall, within thirty days of the receipt of information alleging that a particular class or kind of merchandise is being or is likely to be sold in the United States or

elsewhere at less than its fair value and that an industry in the United States is being or is likely to be injured, or is prevented from being established by reason of the importation of such merchandise into the United States, determine whether to initiate an investigation into the question of whether such merchandise in fact is being or is likely to be sold in the United States or elsewhere at less than its fair value. If his determination is affirmative he shall publish notice of the initiation of such an investigation in the Federal Register. If it is negative, the inquiry shall be closed.

**5.** (b)(1) In the case of any imported merchandise of a class or kind as to which the Secretary has not so made public a finding, he shall, within six months after the publication under subsection (c)(1) of a notice of initiation of an investigation—
(A) determine whether there is reason to believe or suspect, from the invoice or other papers or from information presented to him or to any other person to whom authority under this section has been delegated, that the purchase price is less, or that the exporter's sales price is less or likely to be less, than the foreign market value (or, in the absence of such value, than the constructed value);

**6.** § 164. *Foreign market value*
(a) For the purposes of sections 160 to 171 of this title the foreign market value of imported

speaking, defines foreign market value as the price for home consumption.

Plaintiff argues that various aspects of the decision were not supported by substantial evidence and were not done in accordance with the law.[7] It began by attacking the determination of home market sales in Belgium on four grounds: first, for an alleged failure to investigate whether the sales were actually for home consumption; second, for allegedly not being directed at sales which were on a "level of trade" comparable to the sales to the U.S.; third, for including sales to a related company; and fourth, for being so small in number as to be inadequate for purposes of comparison.

■ The Court finds no deficiency in these four aspects of the administrative determination. The responses of Cockerill and the destinations shown on some of the supporting invoices were sufficient to substantiate the finding that sales of these articles were made for home consumption in the Belgian market as required by 19 U.S.C. § 164(a). In the absence of any contrary or inconsistent information there was no obligation to probe more deeply on this point.

■ Secondly, the necessity to investigate whether a difference in "levels of trade" existed between the Belgian sales and the U.S. sales did not arise. The statute requires that the home market sales used for comparison must be in the usual wholesale quantity and in the ordinary course of trade. 19 U.S.C. § 164(a) (1976). The response from Cockerill that its prices in the two markets did not vary according to class of purchaser and that it did not offer quantity discounts was sufficient, absent any conflicting information, to make further investigation on this point unnecessary. The mere fact that average quantities were lower in the sales in Belgium does not contradict a finding that the sales were comparable under the statute.

■ Thirdly, as to the fact that 50 percent of the home market sales were to a related company, it need only be stated that the law does not remove sales to a related purchaser from consideration as part of home market sales. Common sense, of course, would indicate that strictly by themselves sales to a related purchaser would be a questionable guarantee of a fair home market price. However, if they are made at the same price as sales to independent purchasers, there is no reason why they cannot form part of the total quantity of home market sales used as a benchmark.

■ Fourthly, in the abstract there is no defect in the amount of sales relied on by the Secretary. The total sales for home consumption amounted to 6 percent of sales

merchandise shall be the price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported, in the usual wholesale quantity and in the ordinary course of trade for home consumption (or, if not sold or offered for sale for home consumption, or if the Secretary determines that the quantity sold for home consumption is so small in relation to the quantity sold for exportation to countries other than the United States as to form an inadequate basis for comparison, then the price at which so sold or offered for sale for exportation to countries other than the United States), plus, when not included in such price, the cost of all containers and coverings and all other costs, charges, and expenses incident to placing the merchandise in condition packed ready for shipment to the United States, except that in the case of merchandise purchased or agreed to be purchased by the person by whom or for whose account the merchandise is imported, prior to the time

of exportation, the foreign market value shall be ascertained as of the date of such purchase or agreement to purchase. In the ascertainment of foreign market value for the purposes of sections 160 to 171 of this title no pretended sale or offer for sale, and no sale or offer for sale intended to establish a fictitious market, shall be taken into account. If such or similar merchandise is sold or in the absence of sales, offered for sale through a sales agency or other organization related to the seller in any of the respects described in section 166 of this title, the prices at which such or similar merchandise is sold or, in the absence of sales, offered for sale by such sales agency or other organization may be used in determining the foreign market value.

7. The Court had previously determined that this would be the standard of review. *Connors Steel Co. v. United States*, 1 CIT ——, Slip Op. 81–3 (1981).

for export to countries other than the United States. Although this percentage is at the lower end of the scale, the Court cannot say that it would be an inadequate basis for comparison as a matter of law under 19 U.S.C. § 164(a) (1976). However, these are small percentages and the relative narrowness of the base they provide means that the possibility of a need for further investigation could not be foreclosed. When it is realized that the entire calculation ultimately depends on the 3 percent of sales represented by sales to independent parties, the fragility of the comparison is troubling, if not defective.

■ This brings the Court to plaintiff's most effective argument. Plaintiff attacks the Secretary's failure to investigate whether home market sales were below cost of production as provided for in 19 U.S.C. § 164(b) (1976). That provision reads as follows:

(b) Whenever the Secretary has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, he shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If the Secretary determines that sales made at less than cost of production (1) have been made over an extended period of time and in substantial quantities, and (2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade, such sales shall be disregarded in the determination of foreign market value. Whenever sales are disregarded by virtue of having been made at less than the cost of production and the remaining sales, made at not less than cost of production, are determined to be inadequate as a basis for the determination of foreign market value, the Secretary shall determine that no foreign market value exists and employ the constructed value of the merchandise in question.

Although the Court agrees that the duty described in this provision did not arise here at the very beginning of the investigation, at a later stage it became unavoidable. The original petition focused on the overall necessity for a "less than fair value" determination. As will be further discussed, it contained some information which could have justified investigative suspicion of Cockerill's home market sale price. However, at that stage, the Court does not believe it is reasonable to posit a general duty of the agency to independently explore all the implications of the information supplied.

The sequence of events which gave rise to the duty to extend the investigation to Cockerill's cost of production occurred after the June 13, 1979 tentative determination that sales to the United States had not been made at less than fair value. 44 Fed.Reg. 33997 (1979).

Approximately 51 days before the date of the final decision, plaintiff for the first time called the attention of the agency to the necessity for a cost of production determination. In a pre-conference brief filed on July 24, 1979 it argued that the Customs Service had erred in not going beyond its examination of sales in Belgium to investigate the possibility that those sales were at less than cost of production. [Document 80 in the Public File] It cited in support its allegations that Cockerill's production was subsidized and it supplied information tending to show that Cockerill's sale price was below Connors' cost of production. At an administrative hearing on July 31, 1979 Connors added as support for the necessity of a cost of production determination an argument based on a constructed trigger price which it had included in its original petition. It reasoned that if Cockerill's sale price was below a constructed trigger price it was presumptively below its cost of production.

The final determination of the Secretary addressed these matters as follows:

Counsel for petitioner has claimed that Customs should have investigated the

possibility of sales below the cost of production within the meaning of section 205(b) of the Act [19 U.S.C. § 164(b)], based, *inter alia*, upon petitioner's allegation of subsidization from the Government of Belgium and the European Communities. An allegation of subsidization does not adequately place in issue sales below the cost of production under the Antidumping Act; to the contrary, to the extent a producer's production or sales are subsidized, *its* cost of production may be lessened or its sales revenues increased. Other information presented by counsel for petitioner relevant to the cost of production of certain steel I-beams from Belgium, was presented too late to be considered.

The Court finds that when plaintiff brought the attention of the agency to the need for a cost of production determination, the agency had a reasonable basis to believe or suspect that sales in the home market were at prices representing less than the cost of production. It had a statutory duty to inquire further, and sufficient time to do so. That duty could not be avoided except for the most compelling reasons and the unsupported assertion that it was too late is entirely inadequate. The impossibility of completing the investigation must be substantiated in the record. Consequently, the Secretary's failure to investigate further was not in accordance with the law.

The government argues that Connors presented no evidence directly from Cockerill's costs. This suggests an ingenuous and erroneous standard for proceeding with a cost of production inquiry. On its face, it is unreasonable to expect a party to produce data directly from the costs of production of a competitor. There were at least two significant pieces of information relied on by Connors, and one supplementary matter contained in the record, which provided more than a reasonable basis to proceed.

In urging a cost of production inquiry, Connors relied on a "trigger price" which it

had constructed from the government's trigger price for slightly larger beams. It had earlier used this material in its petition as general support for a dumping investigation. The government's trigger price was a device established to monitor imports of steel. 42 Fed.Reg. 65215. It was based on the costs of production of Japanese steelmakers who are considered to be the most efficient steel producers in the world. Prices lower than the trigger prices were to be subject to an increased likelihood of investigation for possible dumping. See generally, *Davis Walker Corporation v. Blumenthal*, 460 F.Supp. 283 (D.D.C.1978). Connors modified the trigger price for similar beams by adding extra charges to account for the lighter weight, shorter length and greater strength of these beams. The methodology it utilized is plausible and the resulting conclusion is certainly sufficient to raise the question of whether Cockerill's home market price was below what would be the cost of production of the world's most efficient producers.

The government argues that even assuming the legitimacy of this constructed "trigger price," it would have no purpose other than to increase the likelihood that an antidumping investigation would be started, and should be discarded after that. This, however, is an unjustifiably restrictive view. We are not concerned here with the narrow purpose for which trigger prices were created but rather with the permissible inferences and suspicions to which they may give rise. It is plainly suspicious to find a sale price which may be below the cost of production of the world's most efficient producers. Obviously this does not prove that the price was below Cockerill's cost of production, but it does represent a reasonable basis to extend an investigative process.

In addition, Connors offered proof of its own costs of production to show, in conjunction with its claim to approximately the same efficiency of production,[8] that Cocke-

---

8. In its administrative complaint Connors claimed greater efficiency in the melt stage, for its continuous cast billet system and higher

worker productivity. It acknowledged an advantage to Cockerill in the hot rolling portion of production.

rill's sale price was below Connors' cost of production. From this, it would not be unreasonable to surmise that costs and efficiencies of production being approximately equal, Cockerill was selling at a price below its cost of production.

One other piece of information was in the administrative record but was not pointed out or discussed until this judicial review. A general statement appears in Cockerill's 1977 Annual Report that on various occasions, in order to maintain activity in its plants, it had accepted orders whose price did not cover fixed production expenses. [Public Document No. 65, p. 14] Although the government is correct in saying that this does not prove anything about the specific transactions at issue, it certainly should have contributed to the level of investigative curiosity.

When the preceding points are considered in conjunction with the relative sparsity of the home market sales upon which the Secretary relied and the rigorous investigative mandate of the statute, the conclusion becomes irresistible that the investigation should have continued into cost of production.

As a whole this statute displays a notable encouragement to the exercise of investigative powers and authority on minimal information. The entire determination of whether sales are being made at less than foreign market value or home market value is based on whether there is reason to believe or suspect that to be the case. 19 U.S.C. § 160(b)(1)(A) (1976).

■ The duty expressed in 19 U.S.C. § 164(b) (1976) to go beyond home market sales for comparison purposes arises during the course of an ongoing investigation. It represents merely an incremental development in the investigation, which ought to require less justification than is required to begin the investigation itself. In fact, the standard expressed is one which is distinctly conducive to proceeding on the basis of conjecture. It is even less than the proba-

ble cause needed for a search warrant and closer to the standard which allows a party to make discovery in a judicial proceeding. See generally, *De Masters v. Arend*, 313 F.2d 79, 88 (9th Cir. 1963) *cert. dismissed* 375 U.S. 936, 84 S.Ct. 341, 11 L.Ed.2d 269 (1963). See also, *United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).

Congress added the duty to investigate cost of production out of a keen awareness of the fallibility of home market sales prices. In its explanation of the amendment adding 19 U.S.C. § 164(b) to the Trade Act of 1974, the Senate Finance Committee stated:

The Committee is concerned that, in the absence of such a provision, sales uniformly made at less than cost of production could escape the purview of the Act, and thereby cause injury to United States industry with impunity.[9]

■ If anything, the administrative agency ought to be receptive to the need for a cost of production inquiry as the soundest possible verification in questionable circumstances. This is not an area in which the agency has broad discretion to refrain from investigating. That sort of discretion may exist in situations where the investigative methods are amorphous. See for example, *General Motors v. Federal Energy Regulatory Commission*, 613 F.2d 939 (D.C.Cir.1979). Here, however, Congress has seen fit to provide extremely detailed guidance for the commencement and conduct of the investigation.

There is nothing in the statutory scheme to show that a significant development or change in the investigation cannot take place in the final three month period. There is nothing in the law which limits that final period to mere tinkering with the tentative determination and nothing to prevent the final determination from reaching a contrary conclusion.

**9.** S.Rep.No.93–1298, 93d Cong., 2d Sess., 173 (1974), U.S.Code Cong. & Admin.News 1974, p. 7186, 7310.

When a reasonable basis was supplied the Secretary had a duty to investigate further. He could not set unreasonable standards by demanding direct proof and he could not refrain from investigating further simply because it was the second stage of the investigation or because of unsupported conclusions about what could be accomplished in the time remaining.

■ Before concluding, the Court touches on a few subsidiary matters. The government was correct in stating that the allegation that production was being subsidized did not give rise to an obligation to extend the investigation into cost of production. A subsidy would not imply that the sales are below cost of production and there is no authority for the elimination of a subsidy in calculating cost of production, as was proposed by plaintiff.

In a related matter, plaintiff's claim that the Secretary should have begun a countervailing duty investigation in response to the subsidy allegations made in this administrative proceeding is outside the scope of this review. This action is limited to a review of the antidumping investigation. The Secretary's obligations under other statutes are not before the Court.

■ The Court makes one final comment on the matter of subsidization. The Secretary's decision suggested that, if anything, subsidization would lessen cost of production. This reasoning was correct. However, if it implied that the existence of a subsidy is a factor which will weigh against the conduct of an inquiry into whether a home market sales price is below cost·of production, it must be criticized.

It is one thing to reject subsidization as a ground for probing cost of production. It is another thing to let it be a defense against the conduct of such a probe. In the latter case, it would offend public policy if conduct putatively in violation of the countervailing duty law served as a defense to the completion of an investigation under the antidumping law. For this reason the existence of a subsidy on production ought to have no part in the decision on whether to carry the investigation beyond home market sales. Of course, if the actual calculation of cost of production is reached, the relevant subsidies cannot be ignored.

■ For the reasons discussed earlier, the Court finds that the failure to extend the investigation in the manner prescribed by 19 U.S.C. § 164(b) was not in accordance with the law. The proper remedy is to require the correct completion of the administrative proceeding and not, as plaintiff suggests, to require a new proceeding entirely. However, since the Secretary of Commerce now has administrative responsibility in this area, the matter will be remanded to him.[10]

It is therefore Ordered that the Secretary of Commerce shall conduct an investigation into whether the sales of these beams in the home market were at prices representing less than their cost of production and shall report his findings to the Court within 120 days from the date of this decision.

---

**10.** The duties of the Secretary of the Treasury in these matters were transferred to the Secretary of Commerce pursuant to Reorg. Plan No. 3 of 1979, § 5(a)(1)(C), 44 Fed.Reg. 69275, 93 Stat. 1381, eff. Jan. 2, 1980, as provided by section 1–107(a) of Ex.Ord.No. 12188, January 2, 1980, 45 Fed.Reg. 993.