**AL TECH SPECIALITY STEEL CORPORATION; Armco, Inc.; Carpenter Technology Corporation; and Cricible Stainless Steel Division of Colt Industries, Inc., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Ugine Aciers and Intsel Corporation, Intervenors.**

**Court No. 83–1–00118.**

United States Court of International Trade.

Nov. 21, 1983.

---

Collier, Shannon, Rill & Scott, Washington, D.C. (David A. Hartquist, Paul C. Rosenthal and David L. Dick, Washington, D.C., on briefs), for plaintiffs.

J. Paul McGrath, Asst. Atty. Gen., David M. Cohen, Director, Commercial Lit. Branch, Washington, D.C. (Velta A. Melnbrencis, New York City, on briefs), for defendant.

Covington & Burling, Washington, D.C. (Harvey M. Applebaum, Washington, D.C., on briefs), for intervenors.

### Opinion and Order

MALETZ, Senior Judge:

In this action plaintiffs, American producers of specialty steel, challenge the final results of an administrative review conducted by the Department of Commerce, International Trade Administration (ITA), pursuant to section 751(a) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(a) (Supp.IV 1980). *See* 48 Fed.Reg. 2,808 (1983). That review focused on a 1973 dumping finding involving stainless steel wire rods imported from France and produced by intervenors. The ITA determined that a *de minimis* dumping margin of 0.3% existed for the review period.

Plaintiffs have moved for review of the ITA's determination pursuant to rule 56.1 of the rules of this court. In their motion they take issue with two procedural aspects of the ITA's section 751 review. The first is the decision by the ITA not to conduct a cost-of-production investigation under section 773(b) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, 19 U.S.C. § 1677b(b) (Supp. IV 1980).[1] The other is the ITA's

---

**1.** That section provides in part:

(b) *Sales at less than cost of production*

Whenever the administering authority [the ITA] has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than

refusal to verify information submitted by intervenors Ugine Aciers and Intsel Corporation (Ugine Aciers) in the course of the ITA's review.[2] The government has defended its actions through a cross-motion for judgment upon review of the administrative determination.

For the reasons that follow, the court is of the view that the showing by plaintiffs of home market sales below cost of production was insufficient to warrant a cost-of-production investigation by the ITA. However, the court agrees with plaintiffs' contention that the ITA should have verified the information submitted by Ugine Aciers in the course of the ITA's section 751 review. Accordingly, plaintiffs' rule 56.1 motion is granted in part and denied in part; the government's cross-motion is granted in part and denied in part; and the case is remanded to the ITA with instructions to verify the information supplied by Ugine Aciers during the instant section 751 review.

The court first considers plaintiffs' claim that there was reasonable grounds to believe or suspect that Ugine Aciers' home market sales were below its cost of production.

## I

Section 773(b) of the Trade Agreements Act of 1979 provides that the ITA shall

> the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If the administering authority determines that sales [were] made at less than cost of production—
>
>    \*    \*    \*    \*    \*    \*
>
> such sales shall be disregarded in the determination of foreign market value.

**2.** Section 776(a) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, 19 U.S.C. § 1677e(a) (Supp. IV 1980) provides in part:

> [The ITA] shall verify all information relied upon in making a final determination in an investigation. In publishing such a determination, the administering authority shall report the methods and procedures used to verify such information. If the administering authority is unable to verify the accuracy of the information submitted, it shall use the best

investigate a foreign manufacturer's cost of production "whenever [it] has reasonable grounds to believe or suspect that sales in the home market ... have been made at prices which represent less than the cost of producing the merchandise in question ...." 19 U.S.C. § 1677b(b). The phrase "reasonable grounds to believe or suspect" is not, of course, self-defining. In an effort to give content and meaning to those words, this court in *Connors Steel Co. v. United States*, 2 CIT 242, 527 F.Supp. 350 (1981), announced a general evidentiary threshold amounting to less than the probable cause needed to secure a search warrant. *Id.* at 248, 527 F.Supp. at 357. When that threshold is met, the ITA must conduct a cost-of-production inquiry. *Id.* at 249, 527 F.Supp. at 357–58.

While helpful here in some measure, this general evidentiary standard falls somewhat short of providing clear guidance dispositive of the myriad factual situations that will undoubtedly arise. There is, however, an instructive body of law stemming from the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), wherein courts have grappled with the slippery concept of "reasonable suspicion." The upshot has been the formulation of detailed guidelines for determining whether *vel non* such suspicion exists in a given case.[3] The teaching

> information available to it as the basis for its determination, which may include the information submitted in support of the petition.

**3.** It is true that the requirements of reasonable grounds in the administrative law context are not as exacting as in the criminal law sense. *See, e.g., Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978); *Weyerhaeuser Co. v. Marshall*, 592 F.2d 373, 377 (7th Cir.1979); *Chicago Zoological Society v. Donovan*, 558 F.Supp. 1147, 1151 (N.D.Ill.1983). Nevertheless, a crucial common thread runs through each area which provides a useful tool for demarcating the metes and bounds of section 773(b)'s "reasonable grounds to believe or suspect" standard: In both the administrative and criminal law contexts specific, particularized evidence is the touchstone. *See Marshall v. Barlow's, Inc.*, 436 U.S. at 320, 98 S.Ct. at 1824. *See generally* Rothstein, *OSHA Inspections After Marshall v. Barlow's, Inc.*, 1979 Duke L.J. 63.

**1280**

of *Terry* and its progeny is that in order for reasonable suspicion to exist there must be "a particularized and objective basis for suspecting" the existence of certain proscribed behavior, taking into account the totality of the circumstances—the whole picture. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981); *United States v. Merritt,* 695 F.2d 1263, 1268 (10th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983). Elaborating on these criteria the Supreme Court explained in *Cortez:*

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present .... First, the assessment must be based upon all of the circumstances....
>
> The process does not deal with hard certainties, but with probabilities.... Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field ....
>
> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual ... is engaged in wrongdoing. Chief Justice Warren, speaking for the Court in *Terry v. Ohio, supra,* said that "[t]his demand for specificity in the information upon which ...

action is predicated is [this Court's] *central teaching* ...."

*Id.* 449 U.S. at 418, 101 S.Ct. at 695 (emphasis in original). *See also Marshall v. Barlow's, Inc.,* 436 U.S. 307, 320–21, 98 S.Ct. 1816, 1824, 56 L.Ed.2d 305 (1978) (probable cause in the administrative law context is established by *specific* evidence).

In the present case, plaintiffs drew several items to the ITA's attention which taken together, they contend, should have given rise to a "reasonable suspicion" on the ITA's part that Ugine Aciers was selling stainless steel wire rods in France below its cost of producing such merchandise. The government and Ugine Aciers counter that not only was this information presented in an untimely fashion by plaintiffs, it was also insufficient to create such a suspicion.

▮▮▮ Assuming for the present the timeliness of plaintiffs' submission, the court believes that the information presented by them was much too general in nature to arouse a reasonable suspicion of below-cost-of-production sales by Ugine Aciers in its home market.[4] The first two items plaintiffs referred to were a foreign steel industry press release entitled "Eurofer," and a European Commission paper. Those sources indicated that European steel producers had incurred significant increases in raw material and energy costs, but that prices had failed to keep pace. However, the Eurofer press release was a very gen-

---

**4.** In this connection the court notes with concern the following sweeping statement by the government:

> That decision [not to conduct a cost-of-production investigation] should be deferred to by this Court because it is supported by substantial evidence in the administrative record. It is not for this Court to weigh the evidence and substitute its judgment for that of the Commerce Department in order to arrive at the result desired by plaintiffs.

A reviewing court will, of course, pay substantial deference to a magistrate's "reasonable grounds" determination, *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 1512, 12 L.Ed.2d 723 (1964), but this is so because of a magistrate's status as a neutral and detached judicial officer, not as a perhaps overzealous law enforcement agency. *Id.; Donovan v. Federal*

*Clearing Die Casting Co.,* 655 F.2d 793, 798 (7th Cir.1981). Whether the evidence presented to the ITA is sufficient to provide reasonable grounds to believe or suspect *is a question of law which this court must ultimately resolve. See United States v. Rubio,* 703 F.2d 1124, 1129 (9th Cir.1983) (published in advance sheets, but withdrawn from bound volume pending rehearing); *United States v. Glen-Archila,* 677 F.2d 809, 813–14 n. 7 (11th Cir.) ("it is for the court ... ultimately to resolve whether ... the legal standard for reasonable suspicion was met"), *cert. denied,* —— U.S. ——, 103 S.Ct. 165, 74 L.Ed.2d 137 (1982); 19 U.S.C. § 1516a(b)(1)(A) ("The court shall hold unlawful any determination, finding, or conclusion found—... to be unsupported by substantial evidence, *or otherwise not in accordance with law.*" [Emphasis added] ).

eral reference to costs for all European Community steel producers, lumping together both carbon and stainless steel manufacturers throughout the entire European Economic Community. *Cf. Donovan v. Federal Clearing Die Casting Co.,* 655 F.2d 793, 797 & n. 9 (7th Cir.1981) ("We need not belabor the point that all newspaper reports are not of sufficient reliability to form the basis of [a] probable cause determination" in the context of an OSHA search warrant application.). The European Commission paper, when it did refer to the special steel industry, referred to an average of all European special steel prices and costs—not French stainless steel, and not Ugine Aciers' stainless steel wire rod.

■ Plaintiffs next maintain that a series of antidumping and countervailing duty petitions filed in early 1982 against nine European and non-European producers of carbon steel should have alerted the ITA to below cost-of-production sales in France by Ugine Aciers. But allegations of sales below cost of production with respect to diverse producers of *carbon* steel have little if any relevance to an administrative review of sales by a French producer of *stainless* steel wire rod. In this same connection, plaintiffs assert that an antidumping petition containing below-cost-of-production-sales allegations filed against French producers of stainless steel sheet and strip should have caused the ITA to believe or suspect similar such sales by Ugine Aciers. Given that Ugine Aciers does not manufacture or sell stainless steel sheet or strip, the chain of inferences required to reach the conclusion suggested by plaintiffs is far too tenuous.

Quoting from two American trade papers, plaintiffs further claim that a characterization of Ugine Aciers in one of those papers as a "loss-making" operation, and a statement in the other that Ugine Aciers had suffered a $105 million loss, should have provided the ITA with reasonable grounds to believe or suspect less-than-cost-of-production sales of stainless steel wire rod. Be that as it may, the mere use of the adjective "loss-making" fails to show less-than-cost-of-production sales of a single product sold in a discrete market where the company to which the adjective was applied sold a vast range of products in markets around the world. *Cf. Federal Clearing Die Casting Co.,* 655 F.2d at 797 ("Mere journalistic prose is not the kind of underlying factual data upon which a magistrate can exercise [independent] judgment" in an OSHA administrative law context.). And as for the press statement regarding the $105 million loss, considering that Ugine Aciers is a highly diversified, world-wide exporter, evidence of a company-wide loss fails to adequately pinpoint below-cost-of-production sales of an individual product in one of the company's many markets.

The final factor on which plaintiffs rely—and the only evidence which is objective, specific and particularized—is based on the nonconfidential summary of Ugine Aciers' response to the ITA's review questionnaire. On the basis of those figures, plaintiffs speculate that there must have been below-cost sales in the French market during the review period because wire rod prices appeared to them to have remained stable when compared with prices from the summary in the prior review period. While specific and particularized, this is no evidence of sales below Ugine Aciers' cost of production. First of all, the summary did not represent actual prices. Rather, consonant with Commerce Department regulations, *see* 19 C.F.R. § 353.28(a)(1), that summary reflected prices in ranges with a plus-or-minus accuracy of ten percent. Second, in making their argument plaintiffs do not refer to the confidential submission of home market price information which was made available to them. That information indicates that at most Ugine Aciers' prices for most types of stainless steel wire rod sold in France remained stable between review periods, but that for several other types prices increased. Thus, even if specific and particularized, this evidence is much too thin to give rise to any reasonable suspicion of home market sales below cost of production.

The situation presented here is completely dissimilar from that in *Connors*. There, Connors constructed a steel trigger price which showed sales by the foreign manufacturer below that figure. It presented proof of its own costs of production to show, in conjunction with its claim of approximately the same efficiency of production, that the foreign manufacturer's sale price was below cost of production. Finally, it pointed to a statement appearing in the foreign manufacturer's own annual report that on various occasions the latter had accepted orders whose price did not cover fixed production costs. In *Connors*, then, the evidence was specific and particularized. Here, by sharp contrast, the evidence in the main is not. Based on the showing made by plaintiffs, the ITA could have had a belief or suspicion that was nothing more than an "inchoate and unparticularized suspicion or 'hunch,'" *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883, a belief or suspicion which never could have ripened into one that was "reasonable." Plaintiffs' submission, considered as a whole, including the comparison chart of Ugine Aciers' prices from one review period to the next, is "simply too slender a reed to support" the conclusion that there was reasonable grounds to suspect home market sales by Ugine Aciers below its cost of production. *See Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980).

Withal, the court is not insensitive to the burden on American manufacturers of demonstrating reasonable grounds to believe or suspect home market sales below cost of production. It should be clear that an American manufacturer cannot be required to make a showing based on confidential cost information within the exclusive control of its foreign competitor. Indeed, "it is unreasonable to expect a party to produce data directly from the costs of production of a competitor." *Connors*, 2 CIT at 247, 527 F.Supp. at 356. But, all in

all, the evidence presented by plaintiffs is entirely too remote and generalized to give rise to a reasonable suspicion of below-cost-of-production sales by their French competitor. Accepting plaintiffs' contention would require straying into the realm of surmise.

■ In sum, absent a *specific* and *objective* basis for suspecting that a *particular* foreign firm is engaged in home market sales at prices below its cost of production, section 773(b)'s threshold requirement of "reasonable grounds to believe or suspect" has not been satisfied. *See Federal Clearing Die Casting Co.*, 655 F.2d at 797–98; *Weyerhaeuser Co. v. Marshall*, 592 F.2d 373, 377 (7th Cir.1979).

The court turns next to plaintiffs' claim that the ITA was obligated to verify the information submitted to it by Ugine Aciers in the course of its section 751 review.

## II

■ Pointing to section 776(a) of the Trade Agreements Act of 1979, 19 U.S.C. § 1677e(a), plaintiffs argue that the ITA was required to verify the information submitted by Ugine Aciers. The government seizes upon the language in section 776(a) —"verify all information relied upon in making *a final determination in an investigation*"—in support of its position that a section 751 review is a "proceeding," not an "investigation," and that the ITA is, therefore, not required to verify information submitted in such a "proceeding." Ugine Aciers, agreeing with the government, has nonetheless expressed its continued willingness to submit to verification.

The government argues that nowhere in section 751 did Congress refer to a section 751 review as an "investigation", nor did Congress provide for a "final determination" in the case of periodic reviews under that section.[5] By contrast, the government

---

5. Section 751, 19 U.S.C. § 1675 (Supp.IV 1980), provides in part:

§ 1675. *Administrative review of determinations*

(a) *Periodic review of amount of duty*

(1) *In general*

At least once during each 12-month period beginning on the anniversary of the date of publication of a ... finding under the Antidumping Act, 1921, ... the administering au-

points out, in two sections of the Trade Agreements Act of 1979 Congress specifically provided for "final determinations" by the ITA during the phase between the commencement of an "investigation" and the publication of an antidumping duty order. *See* 19 U.S.C. §§ 1671d and 1673d (Supp. IV 1980). Accordingly, the government contends, a section 751 review "proceeding" does not literally fall within the verification obligation of section 776(a). In further support of its position that a section 751 review is a "proceeding," the government cites certain regulations in which the Commerce Department distinguishes between an "investigation" and a "proceeding," [6] the former describing a more narrow phase of the administrative process, the latter being all-encompassing.

However Commerce may have devised its "proceeding/investigation" distinction, it is nevertheless evident both from the statute and the legislative history of section 751 that a section 751 review results in "a final determination in an investigation," albeit periodic in nature.

First, the Senate Report on the Trade Agreements Act of 1979 explained:

Subsection (a)(2) of section 516A would render *certain final determinations* subject to judicial review in the Customs Court at the instance of any "interested party" as defined in subsection (f)(3). These *final determinations* would be confined in subsection (a)(2)(A) to: (1) final determinations regarding the imposition of a countervailing or antidumping duty; (2) *periodic determinations of the*

*amount of countervailing or anti-dumping duties to be imposed;* (3) determinations to suspend antidumping or countervailing duty investigations as the result of an agreement eliminating the injurious effects caused by the subsidies or sales at less than fair value; (4) determinations by the International Trade Commission resulting from the review of an agreement to eliminate the injurious effect of subsidized imports or sales at less than fair value.

S.Rep. No. 249, 96th Cong., 1st Sess. 247 (1979) (emphasis added), *reprinted in* 1979 U.S.Code Cong. & Ad.News 381, 633. In addition, that same Senate Report, as well as the House Report, makes clear that a section 751 review represents the duty assessment phase of an antidumping duty investigation:

This provision [section 751] expedites the administration of the assessment phase of antidumping and countervailing duty investigations.

S.Rep. No. 249, 96th Cong., 1st Sess. 80–81 (1979), *reprinted in* 1979 U.S.Code Cong. & Ad.News 466–67. *Accord* H.R.Rep. No. 317, 96th Cong., 1st Sess. 72 (1979). Thus, Congress viewed a section 751(a) review as one of several kinds of final determinations which may be made in the course of an antidumping duty investigation.[7]

Moreover, the statutory responsibilities of the ITA in a section 751 antidumping duty review are truly investigatory in nature. Section 751(a)(2), 19 U.S.C. § 1675(a)(2), requires the ITA to determine

(A) the foreign market value and United States price of each entry of merchan-

thority, after publication of notice of such review in the Federal Register, shall—

\* \* \* \* \* \*

(B) review, and determine (in accordance with paragraph (2)), the amount of any antidumping duty, ...

\* \* \* \* \* \*

and shall publish the results of such review, together with notice of any duty to be assessed, estimated duty to be deposited, or investigation to be resumed in the Federal Register.

**6.** 19 C.F.R. § 353.11(b) (1982) provides:

An "investigation" refers to that time between the publication of a notice of initiation

and the publication of the earliest of (1) a notice of termination, (2) a negative determination that has the effect of terminating the administrative proceedings; or (3) an Order. 19 C.F.R. § 353.11(a) (1982) provides:

A "proceeding" refers to that time from the filing of a petition (or publication of a notice of self-initiation under section 732(a) of the Act) until the publication of the earliest of: (1) A notice of termination, (2) a negative determination that has the effect of terminating the administrative proceedings; or (3) a notice of revocation of an Order.

**7.** Indeed, section 776(a) refers to *"a* final determination," not *"the* final determination."

dise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such entry exceeds the United States price of the entry.

This determination is more than a mere mathematical exercise. The data necessary for these computations must be obtained from the foreign manufacturer or importer. Section 751(a)(2) in fact contemplates just such data gathering as evidenced by its admonition to the ITA not to reveal "confidential information" when publishing the final results of its section 751 review in the Federal Register. *See* 19 U.S.C. § 1675(a)(2). This subsection, in substance, describes an agency investigation in the course of which a final determination will be made, the ITA's regulations to the contrary notwithstanding. *See Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979) ("Although an agency's interpretation of the statute under which it operates is entitled to some deference, 'this deference is constrained by our obligation to honor the clear meaning of a statute, as revealed by its language, purpose, and history.' ").

Besides relying on its own regulations, the government also contends that since plaintiffs have not attributed any error in the final results to lack of verification, nor have they suggested that the information submitted by Ugine Aciers was inaccurate, unreliable or untrustworthy, they cannot complain about non-verification. This argument is not only disingenuous, it completely misses the mark. For without verification *neither* the government nor plaintiffs—nor the court for that matter—is in a position to evaluate the accuracy or reliability of Ugine Aciers' submission and, ultimately, *that of the ITA's final results. This* is the point. It is not incumbent upon plaintiffs to either show or allege supple prevarication by Ugine Aciers in order to challenge the ITA's failure to verify. The government's reliance on the harmless error rule is, therefore, misplaced. *Compare*

*The Timken Co. v. Regan*, 4 CIT ——, 552 F.Supp. 47, 52 (1982) ("It is basic that procedural irregularities by an administrative agency are not per se prejudicial.").

In the last analysis, to allow information submitted by a foreign manufacturer in the course of a section 751 review to escape verification would make a mockery of the Trade Agreements Act of 1979. One of the primary criticisms voiced by Congress when drafting that Act was the lax enforcement of the antidumping duty law by the Treasury Department, particularly when it came to assessment of duties:

The Committee is very dissatisfied with the past record of the Secretary of the Treasury in assessing duties on entries subject to a dumping finding.

H.R.Rep. No. 317, 96th Cong., 1st Sess. 69. It was this dissatisfaction which provided the impetus for transferring responsibility for administering the countervailing and antidumping duty laws from Treasury to Commerce. To now permit the ITA to conduct a section 751 review—the all important duty assessment phase of an antidumping duty investigation—without at the same time requiring it to verify information submitted to it in the course of such a review would be in effect to allow that agency to repeat the shortfalls of its predecessor. Not only was such a result not contemplated by Congress, it would be inimical to Congress' unequivocal direction that the ITA vigorously enforce the antidumping duty law. *See* H.R.Rep. No. 317, 96th Cong., 1st Sess. 48 ("The Committee feels very strongly that both the countervailing and antidumping duty laws have been inadequately enforced in the past . . . . The provisions of this bill are intended to remedy this situation."). In the face of such a compelling congressional expression, pleas of administrative inconvenience based on an alleged "verification" burden ring hollow.

In short, it makes little sense to require detailed verification of all information submitted by foreign manufacturers during the less-than-fair-value investigation stage, but not to likewise require such verification when the agency actually assesses antidumping duties. It would stultify congres-

sional purpose to say that the ITA has no duty to verify information submitted by a foreign manufacturer in the course of a section 751 review. *See Asahi Chemical Industry Co. v. United States*, 4 CIT —, 548 F.Supp. 1261, 1267 (1982) ("If a reading of a statute leads to a result which is 'contrary to the congressional intent and leads to absurd conclusions,' it is to be rejected."). Accordingly, considerations of sound and prudential administration of the antidumping duty law mandate verification of information by the ITA at this most critical phase.

### III

For all the foregoing reasons, plaintiffs' motion for review of the administrative determination is granted in part and denied in part; the government's cross-motion for judgment upon review of the administrative determination is granted in part and denied in part; and the case is remanded to the ITA with directions to verify the information submitted by intervenors in the course of the agency's latest section 751 review.