**FLORAL TRADE COUNCIL OF DAVIS, CALIFORNIA, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**Court No. 87–04–00627.**

United States Court of
International Trade.

Dec. 27, 1988.

See also 704 F.Supp. 241.

Stewart & Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., and Jimmie V. Reyna), Washington, D.C., for plaintiff.

John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch (Elizabeth C. Seastrum), Civil Div., U.S. Dept. of Justice, Washington, D.C., Douglas S. Cohen, Office of Import Administration, U.S. Dept. of Commerce, for defendant.

## OPINION

RESTANI, Judge:

This is one of several actions challenging International Trade Administration (ITA) determinations rendered as a result of a petition filed by plaintiff concerning fresh cut flowers from eight countries. This particular case involves antidumping duties with regard to miniature and standard carnations and pompon and standard chrysanthemums from Ecuador. The final determination at issue resulted in findings of weighted average dumping margins for various producers of between 2 and 19 percent. *Certain Fresh Cut Flowers From Ecuador*, 52 Fed.Reg. 2,128 (Jan. 20, 1987), as amended 52 Fed.Reg. 8,494 (Mar. 18, 1987).

Plaintiff takes issue with the adequacy of the investigation, and the methodology used, as well as with certain decisions made with regard to calculation of foreign market value derived from cost of production data.

## I. *Failure to Conduct a Below Cost of Production Investigation*

Plaintiff's first claim is that defendant failed to fulfill its statutory duty to conduct a less than cost of production investigation. In its determination, ITA stated that the request to conduct such an investigation one month in advance of the final determination was untimely and would be denied on that basis.

Section 773(b) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677b(b) (1982) provides:

**(b) Sales at less than cost of production.**

Whenever the administering authority has reasonable grounds to believe or suspect that sales in the home market of the country of exportation, or, as appropriate, to countries other than the United States, have been made at prices which represent less than the cost of producing the merchandise in question, it shall determine whether, in fact, such sales were made at less than the cost of producing the merchandise. If the administering authority determines that sales made at less than cost of production—

(1) have been made over an extended period of time and in substantial quantities, and

(2) are not at prices which permit recovery of all costs within a reasonable period of time in the normal course of trade,

such sales shall be disregarded in the determination of foreign market value. Whenever sales are disregarded by virtue of having been made at less than the cost of production and the remaining sales, made at not less than cost of production, are determined to be inadequate as a basis for the determination of foreign market value under subsection (a) of this section, the administering authority shall employ the constructed value of the merchandise to determine its foreign market value.

In this case, plaintiff did not specifically request ITA to perform a less than cost of production analysis at the time it filed its petition. Apparently, at that time, plaintiff

did not possess data which it believed would constitute "reasonable grounds to believe or suspect" that such an investigation should be undertaken. *See* 19 U.S.C. § 1677b(b) (1982). Defendant does not dispute this, but avers that by the end of October plaintiff knew everything it knew on December 12 when plaintiff actually requested such an investigation and that clearly one month is too short a time in which to conduct an investigation. (Plaintiff does not appear to disagree with defendant's assertion that one month is an insufficient amount of time to conduct a cost of production investigation.) It is unclear whether ITA would have acceded to plaintiff's request had it made it one month or six weeks earlier, but plaintiff offers no acceptable reason for not immediately alerting ITA as soon as it possessed information it contends indicates that a less than cost of production investigation was necessary.

 The argument plaintiff makes here is that ITA had reasonable grounds to suspect that the investigation was needed as early as September and that under the statute it had a duty to perform the investigation without waiting for a request from plaintiff. It is well accepted that ITA's duties are largely investigatory,[1] but given the burdens placed upon ITA by the statute it is not reasonable to expect ITA in every case to pursue all investigative avenues, even such important areas as less than cost of production sales, without some direction by petitioners. It should be remembered that cost of production need not be investigated in every case, but only when reasonable grounds are present. Part of whether ITA has "reasonable grounds to believe or suspect" that a less than cost of production analysis is needed is whether it has been requested. *See Floral Trade Council v. United States,* 698 F.Supp. 925 (C.I.T.1988) (Review of ITA final determination as to fresh cut flowers from Costa Rica).

Plaintiff argues further that even if it has some duty to act, it was obvious from the record that home market sales were being made at less than cost of production, and therefore there was no need for such a request. The court finds that the need for the investigation was not as obvious as plaintiff claims it to be.

 In its petition, plaintiff gave cost of production figures based on costs in the United States, but said nothing about the need for a below cost of production investigation. Available to ITA was some information on cost of production for Columbia. At least one source indicated that production conditions in Ecuador were only slightly different from those in Columbia. By mid-September, ITA also had home market price data from some Ecuadorian producers. Those figures indicated that Ecuadorian sales data available to ITA were at values less than the non-Ecuadorian cost of production. In mid-September, however, ITA had not determined what adjustments to petitioner's cost of production figures should be made to make them appropriate to Ecuador. By the end of October, ITA had arrived at a proxy production cost figure for Ecuador based on "best information available." Thus, by the end of October ITA had some information available to it from which it might have concluded that sales in Ecuador might have been at less than the cost of production. Nonetheless, ITA was not required to conclude *sua sponte* that cost of production in Ecuador, in reality, would approximate the proxy figure, which would be the basis of any suspicion of less than cost sales. The best information available rule allows the agency to use values which may have little to do with reality. The information used as best information available may form the basis of a reasonable suspicion, under certain circumstances, that less than cost of production sales are occurring. It does not necessarily follow from this that the need for the investigation was facially apparent here.[2]

---

**1.** *Timken Co. v. United States,* 10 CIT 86, 92, 630 F.Supp. 1327, 1333 (1986), *see Connors Steel Corp. v. United States,* 2 CIT 242, 527 F.Supp.

350 (1981), *modified,* 3 CIT 79, 566 F.Supp. 1521 (1982).

**2.** The court does not reach defendant's argument that, as a matter of law, this type of data

■ The court finds that given ITA's need to synthesize data and to draw various conclusions from evidence not directly applicable to the home market in order to arrive at any opinion as to whether a below cost of production investigation should be undertaken, the need for the investigation cannot be described as obvious. Due to the late development of the relevant information, plaintiff was under an obligation to notify ITA as soon as possible of its belief that such an investigation was needed and the reason for its belief. Under the circumstances of this case, ITA was not unreasonable in declining to conduct a less than below cost investigation requested one month prior to the issuance of the final determination.[3]

## II. *Use of Monthly Averaging for U.S. Price Purposes*

The next issue raised by plaintiff is whether the use of monthly averages to calculate United States price unreasonably obscures dumping during low demand periods.

Pursuant to the Trade and Tariff Act of 1984, Pub.L. No. 98–573, Title VI, § 620, 98 Stat. 3039, the antidumping law was amended to expressly permit use of averaging in the determination of U.S. price. 19 U.S.C. § 1677f–1 (Supp. IV. 1986) now reads:

### § 1677f–1. Sampling and averaging
### (a) In general

For the purpose of determining United States price or foreign market value under sections 1677a and 1677b of this title, and for purposes of carrying out annual reviews under section 1675 of this title, the administering authority may—

> (1) use averaging or generally recognized sampling techniques whenever a significant volume of sales is involved or a significant number of adjustments to prices is required, and

> (2) decline to take into account adjustments which are insignificant in relation to the price or value of the merchandise.

### (b) Selection of samples and averages

The authority to select appropriate samples and averages shall rest exclusively with the administering authority; but such samples and averages shall be representative of the transactions under investigation.

■ Thus, although averaging may be used under the circumstances described in subsection (a), it may not be utilized in a manner that produces results which are "unrepresentative." 19 U.S.C. § 1677f–1(b). The purpose of the amendment was to ease ITA's burdens. H.R.Rep. No. 725, 98th Cong., 2d Sess. 45–46 (1984), U.S.Code Cong. & Admin.News 1984, pp. 4910, 5172, 5173. An interpretation of the statute which furthers that goal and is still within the strictures of the statute will be sustained.

■ The first question to be addressed in this case is whether subsection (a) of the statutes is satisfied. The proceeding under review was initiated by simultaneous petitions by this plaintiff covering over 260,000 sales transactions, although the Ecuadorian sales subject to investigation totaled only several hundred. Nonetheless, investigation of the hundreds of thousands of related sales proceeded at the same time, subject to the same strict statutory time limits. The court accepts ITA's view, evidenced in the determination, that when ITA is conducting a number of investigations simultaneously as a result of petitions by one party relating to the same product class, it may determine whether a "significant volume of sales" or number of adjustments are involved, on the basis of all of the transactions involved in the related in-

---

cannot form a reasonable basis to suspect less than cost of production sales. Defendant cites *Al Tech Specialty Steel Corp. v. United States,* 6 CIT 245, 575 F.Supp. 1277 (1983), *aff'd on other grounds,* 745 F.2d 632 (Fed.Cir.1984) in support of this argument. Here, ITA made no decision on this issue.

**3.** Although plaintiff's delay was only six weeks, in the context of the short time frames provided by the statute, it was a serious delay.

vestigations. Thus, in this case,[4] some type of averaging, that was also "representative," was permitted by the statute.[5]

 The next question to be addressed is whether the particular form of averaging selected by ITA results in margins which are "unrepresentative" under subsection (b) of the statute. Plaintiff argues that the legislative history indicates that representativeness should be judged on what the results would be absent averaging. H.R.Rep. No. 725, 98th Cong., 2d Sess. 46, *reprinted in* 1984 U.S.Code Cong. & Admin.News 5127, 5173 states that averaging should not produce a "loss of reasonable fairness in the results." Plaintiff also cites the statement of the Deputy Assistant Secretary for Import Administration: "[t]here will be some minor effects, and I am not sure which way they go to be honest. I would give up some of the thousandths, or hundreds, or even tenths of percentage points for just getting rid of that enormous quantity of work." *Option to Improve the Trade Remedy Laws,* Hearing before the Subcomm. on Trade, Comm. of the House Ways and Means Committee, 98th Cong., 1st Sess., Serial 98-15 at 560 (1983).

First, this type of somewhat ambiguous "off the cuff" statement at a hearing would seem to be relatively weak evidence of Congress' intent with regard to the statute finally enacted, especially in view of other more formal statements of purpose. Second, averaging would not be an effective work saving device (which is the reason emphasized by the quoted proponent), if ITA must calculate a result based on transaction by transaction analysis in order to determine whether averaging is permissible. Third, what the result would have

been had the case arisen before 1984 is not clear. Prior to 1984, ITA did use sampling to establish U.S. price, *see Fresh Winter Vegetables from Mexico,* 45 Fed.Reg. 20,-512, 20,515 (1980) (Final Determination of Sales at not LTFV), and averaging was not expressly forbidden by the statute. In fact, in *Winter Vegetables* at least some conclusions as to U.S. price were based on averaged data. 45 Fed.Reg. at 20,516. In addition, the regression analysis employed in that case did not treat U.S. prices in ITA's "traditional" manner.[6] *Id.* Therefore, although it is difficult to say exactly what the pre-1984 result would have been, averaging and other non-traditional treatments of U.S. prices were not unknown in pre-1984 ITA determinations.

As in *Winter Vegetables,* perishability and resulting price fluctuation is one of the reasons for employing a non-traditional methodology such as sampling or averaging. It is clear that flowers, which only remain saleable at full price for several days at the outside, are perishable. Averaging of prices on a daily or weekly basis would be one reasonable means of avoiding penalizing producers for normal selling practices necessitated by the rapid deterioration of the merchandise at issue. Averaging on such a short-term basis prevents ordinary course of business "end-of-life" sales prices from producing unreasonably high margins not reflective of actual overall dumping patterns. In a case such as this, transaction by transaction analysis may distort the margin because of ITA's consistent practice in transaction by transaction analysis of counting above fair value sales as being at fair value.[7] As ITA stated, "a producer whose normal sales are at prices above fair value could be found to be dumping solely because of these end of the

4. For the purpose of the case the court will assume little difficulty in the related cases with utilization of computer tapes for most of the 260,000 transactions. Congress may be presumed to have been aware of the possibility of computerization when it permitted averaging in cases involving significant numbers of transactions with only the qualification of representativeness.

5. In sanctioning cumulative analysis of imports from various countries in certain International

Trade Commission investigations, Congress recognized the interrelatedness of certain unfair trade cases. ITA should be permitted to adjust to problems arising from similar considerations.

6. *See infra* discussion and note 7.

7. This practice was approved under other circumstances in *Serampore Indus. v. United States,* 11 CIT ——, 675 F.Supp. 1354 (1987).

day transactions." 52 Fed.Reg. at 2,129. If ITA did not employ some averaging in this case, it would have had to adopt other methods to account for the perishability factor in order for the U.S. price data to be "representative" of reality.

As ITA averaged not on a daily or weekly basis, which would account for the perishability problem, but on a monthly basis, the court believes further explanation of the reason for monthly averaging should be discernible if the decision is to be sustained. One reason put forth by ITA is that consignees in the United States reported sales to producers on a monthly basis, and "[f]or exporters in some countries the only information available on United States sales is monthly totals." 52 Fed.Reg. at 2,129–30. This circumstance, however, does not prevent ITA from requesting specific transaction information or weekly average rates and, in appropriate circumstances, from using information less favorable to the respondent, if the requested information is not provided.[8] The statutory scheme, however, favors actual price data, if it can be used in a manner consistent with other provisions of the statute. Thus, the availability of monthly data is one factor which ITA may consider in determining the period it will use for averaging. Other factors were also considered.

Flower prices rise and fall over an entire year because flower prices rise prior to holidays. Accordingly, production is geared to such times. At other times volume and prices fall. To account for this pattern of production and pricing, ITA doubled the normal period of its investigations to cover one entire year's cycle. This doubling of the cycle, for the most part, benefitted plaintiff because it brought the summer and fall months of lower U.S. flower prices into the investigation. Most spring and winter months are high price times in the United States because of Christmas, Valentine's Day, Easter and Mother's Day. ITA considered each month separately so that high sales prices in spring and winter months would not mask dumping during the summer and fall months. Plaintiff argues that monthly averaging is too broad and that high prices at the beginning of May, for example, will obscure low month end prices. Plaintiff further argues that sales to customers targeted for low prices will be obscured. Plaintiff, however, has not demonstrated by citation to evidence of record that any significant obscuring of dumping occurs when monthly as opposed to weekly averaging is used.[9] In contrast, respondents claimed that monthly averaging exaggerated dumping because the home market holiday schedule differs somewhat from that in the United States, and that averaging over three or six months would better reflect the reality of a normal sales pattern. *See* 52 Fed.Reg. at 2132 (Respondent's Comment 4). Thus, neither side thought that monthly averaging would result in an appropriate representation. One side thought it was too broad, one side thought it was too narrow.

In order to take a consistent approach utilizing readily available real data reported to respondents by consignees, to lessen the potential for prejudice to respondents while attending to plaintiff's request, and to ease its overall burdens so as to complete processing of plaintiff's petition according to statutory time periods, ITA used monthly averages. Under these circumstances and absent specific evidence that this form of averaging resulted in margins which are not representative, the court cannot find a conflict with the statute. It is not necessary to nearly duplicate pre–1984 results (whatever they may be) in order to utilize averaging; nor is it necessary to check the results in every case by using a regression analysis of the type employed in *Winter Vegetables.*[10] There may be better

8. Whether data could have been obtained directly from importers on a transaction by transaction basis does not seem relevant as ITA would not have been able to conduct verifications at multiple importer locations.

9. Plaintiff gives examples of higher margin calculations if traditional transaction by transaction data is used. As indicated, in this case such a methodology would not be reasonable.

10. *Winter Vegetables* did not involve a fluctuating full yearly cycle and the regression analysis was used to check a negative result. The result here was affirmative.

ways to conduct an investigation as to perishable merchandise, but if so, such a fact would not be determinative. The court does not find ITA's particular methodology unreasonable in the context of an industry which operates on predictable (but different foreign and U.S.) yearly cycles of rising and falling prices and includes regular low price sales of deteriorating merchandise. Use of averaging here produced representative results.

### III. Cost of Production for Eden Flowers

ITA used best information available to construct a foreign market value for Eden Flowers, because Eden Flowers did not respond properly to ITA's questionnaire. ITA used much of the U.S. based cost of production data provided by plaintiff in order to arrive at a constructed value. It made some adjustments to account for different practices in the home market and otherwise, to which Floral Trade objects.

### A. Interest Expenses

■ First, ITA reclassified interest expenses to the general expenses category. Classifying interest expenses as materials and fabrication costs would increase the base figure upon which floors for general expenses and profit are based. See 19 U.S.C. § 1677b(e)(1) (1982 & Supp. IV 1986). Defendant argues that interest expenses attributable to general working capital loans ordinarily would be used for entire business operations and not just for production or fabrication. As such, they would be normally considered by ITA to be general expenses which are computed separately from the cost of materials and fabrication.[11]

Plaintiff argues that, due to the seasonal nature of production, interest expenses relate directly to production. ITA has stated in several of its flower determinations, including this one and *Certain Fresh Cut Flowers from Colombia*, 52 Fed.Reg. 6842, 6845 (1987), that interest expenses for working capital are general expenses.

This also comports with Ecuadorian accounting practice. ITA's classification of working capital interest expenses is reasonable.

### B. Officers' Salary Expenses

■ Plaintiff's next argument is that "officers' salary" expenses should not have been moved to the general expense category. ITA does not dispute that in the United States, growers perform direct production functions, including labor. Defendant states that because evidence was submitted indicating that this was not the practice in Ecuador, ITA moved the officers' salary expenses figure (based on U.S. production costs) to the general expenses category. This, of course, lowered the base "materials and fabrication" figure and ITA merely added the ten percent minimum general expense figure required by statute. 19 U.S.C. § 1677b(e)(1)(B). With regard to this adjustment, defendant seems to argue that it may make less than fully logical adjustments because it is proceeding on best information available. The court believes that ITA must always act reasonably in using best information available, and that it may not employ this principle to benefit a party who did not cooperate fully, to the detriment of petitioner.[12]

■ Had ITA based its calculation of cost of production on Ecuadorian base figures, there would be a basis for its action. As defendant's original brief indicated, its arguments on this issue stem largely from the data about Ecuadorian companies who provided data. Eden flowers is in a different category; its cost data is based on that of U.S. producers, as adjusted. If one is using U.S. cost data as a base, as appears to be the case here, one must decide how much of cost in the United States relates to production and then such cost may be adjusted where appropriate for differing labor rates in the foreign coun-

---

11. ITA recognizes an exception for discrete manufacturing projects extending over time. 52 Fed.Reg. 2,130.

12. The best information available rule is found at 19 U.S.C. § 1677e (1982 and Supp. IV 1986).

try.[13] The reasons expressed by ITA fail to take into account the fact that if officers in Ecuador do not work in production, they presumably must hire someone to perform production tasks similar to those performed by growers in the United States. Any adjustments made to the U.S. cost figures must take into account the framework of the base cost data.

The record contains an indication that some percentage of the U.S. owner salary figure may be allocable to labor. *See* Confidential Record Document Number 4 at 621A.[14] Plaintiff suggests a methodology in which ITA could strip out owners' salaries from production costs, and then add the amount of labor necessary to replace that performed by the U.S. owners, perhaps by referring to the salaries paid in Ecuador to the managers on Ecuadorian flower farms. ITA may employ any reasonable method which accounts for full labor costs. Its current methodology, which does not account for such costs, unreasonably favors the non-fully complying respondent.

### C. *Agronomist Salary Expense*

 Next, Floral Trade Council argues that agronomists' salaries should not be treated as general expenses because they are direct production costs. Because Florisol, the only producer whose cost data was verified and is also known to use an agronomist, produced flower and non-flower products, ITA did not treat agronomy costs as directly related to flower production. This is not a logical explanation of the treatment of agronomy costs because it does not address whether the work of agronomists is related to basic production or not. If agronomists' salaries are basic production costs, the Florisol figures could be allocated between flower production and other production. If agronomy expenses are production costs but they are performed by owners in the United States, as is indicated by some information, then a proper adjustment for owner salaries will also properly account for this cost. If agronomy costs are in addition to the type of tasks performed by U.S. growers and laborers and are also production costs, they should be added to the "fabrication" cost figures. The explanation provided by ITA related to Florisol is not adequate to support its decision.

This matter is remanded for reconsideration by ITA of its treatment of officers' salary expenses and of agronomists' salaries and further for explanation of each of these decisions related to standards for calculating cost of production. ITA shall file its remand determination in 30 days. Plaintiff shall confer with opposing counsel and submit a briefing schedule within 10 days thereafter.

---

**13.** The explanation at page 34 of document 1 of the administrative record indicates that the labor costs listed on p. 35 thereof were adjusted by applying a different wage rate. The Colombian labor cost figure, which was used as a proxy for Ecuadorian labor cost, is not based on the average number of laborers actually utilized for flower production in Colombia. The figure is simply a fraction of the U.S. cost.

**14.** ITA has also not made clear how it treats supervisory labor. Generally, supervisory labor and other costs such as equipment depreciation are considered factory overhead. W. Morse & H. Roth, *Cost Accounting* 29 (3rd ed. 1986). The court is unclear as to whether all factory overhead is considered a basic production cost by ITA or not. This would also affect the percentage of the owners' salary figure to be allocated. Some explanation by ITA of how it draws the line between basic production costs and general expenses, both in general terms and as to the flower industry, would be useful.