**AL TECH SPECIALTY STEEL CORP., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Court No. 84–08–01192.**

United States Court of International Trade.

Dec. 1, 1986.

Collier, Shannon, Rill & Scott, David A. Hartquist, Paul C. Rosenthal, Jeffrey S. Beckington, Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Platte B. Moring, III, Civ. Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## OPINION

RESTANI, Judge:

Plaintiffs contest the results on remand to the International Trade Administration of the Department of Commerce (Commerce) of an early determination of antidumping duties imposed on entries of tool steel produced by Arbed Saarstahl GmbH (Saarstahl), a West German manufacturer.[1]

---

[1] These remand results were published in the Federal Register on March 24, 1986. 51 Fed. Reg. 10,071 (1986).

Specifically, plaintiffs challenge Commerce's decision not to include subsidies in cost of production and constructed value calculations made pursuant to section 736(c) of the Tariff Act of 1930 as amended (Act). 19 U.S.C. § 1673e(c) (1982).

On July 25, 1984, Commerce published the final results of its accelerated review of Saarstahl's entries of tool steel between January 12 and July 19, 1983. 49 Fed.Reg. 29,995 (1984). In that determination, Commerce refused to add the amount of subsidies received by Saarstahl to the company's expenses in calculating cost of production and constructed value.[2] Plaintiffs commenced an action to challenge those results and Commerce consented to a remand order on the subsidies issue. On remand, Commerce responded to additional comments on the subsidies issue and again concluded that subsidies should be excluded · from its calculations.[3] Commerce concluded that the costs recorded in Saarstahl's books fairly represented the costs of producing the products. 51 Fed.Reg. at 10,072. Plaintiffs then filed the Renewed Motion for Judgment Upon an Agency Record that is presently before this court.

Under the Act, dumping margins are measured by calculating the amount by which foreign market value (FMV) exceeds the United States price (USP) of imported merchandise. 19 U.S.C. § 1673 (1982 & Supp. II 1984). The methods by which FMV and USP are determined are specifically provided for in the Act. 19 U.S.C. §§ 1677b (FMV), 1677a (USP). Where, as here, merchandise identical or similar to the imported merchandise is sold or offered in the home market of the country of exportation, FMV is calculated pursuant to section 773(a) of the Act by resort to domestic prices, with certain specified adjustments. 19 U.S.C. § 1677b(a)(1)(A) (1982 & Supp. II 1984). Section 773(b) provides, however, that home market sales "made over an extended period of time and in substantial quantities ... [that] are not at prices which permit recovery of *all costs* within a reasonable period of time in the normal course of trade, shall be disregarded in the determination of foreign market value." 19 U.S.C. § 1677b (1982) (emphasis added). This section further provides that

[W]henever sales are disregarded by virtue of having been made at less than the *cost of production* and remaining sales, made at not less than *cost of production*, are determined to be inadequate as a basis for the determination of foreign market value [through home market sales], the administering authority shall employ the constructed value of the merchandise to determine its foreign market value.

*Id.* (emphasis added).

Commerce concluded, in its accelerated review and on remand, that Saarstahl's home market sales were *not* less than the cost of production, and thus apparently calculated FMV through constructed value only where there were no contemporaneous home market sales for comparison with USP. 51 Fed.Reg. at 10071; 19 U.S.C. § 1677b(a)(2) (1982). The elements of constructed value used by Commerce are defined in section 773 of the Tariff Act as

(A) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such materials or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the production of that particular merchandise in the ordinary course of business;

---

**2.** The subsidies alleged to benefit Saarstahl's tool steel production include interest-free loans and funds for restructuring.

**3.** Commerce's remand determination also corrected alleged errors in its calculations and thereby increased Saarstahl's weighted-average dumping margin for the period under review from 8.09 percent *ad valorem* to 19.13 percent *ad valorem.* 51 Fed.Reg. at 10,072. Saarstahl is challenging that determination in a separate action before this court. Court No. 86–04–00469.

(B) an amount for general expenses and profit equal to that usually reflected in sales of merchandise of the same general class or kind as the merchandise under consideration which are made by producers in the country of exportation, in the usual commercial quantities and in the ordinary course of trade, except that—

(i) the amount for general expenses shall not be less than 10 percent of the cost as defined in subparagraph (A), and

(ii) the amount for profit shall not be less than 8 percent of the sum of such general expenses and cost; and

(C) the cost of all containers and coverings of whatever nature, and all other expenses incidental to placing the merchandise under consideration in condition, packed ready for shipment to the United States.

19 U.S.C. § 1677b(e)(1) (1982 & Supp. II 1984).

Plaintiffs argue that sections 773(b) and (e) require that costs be calculated by adding subsidies benefiting production in Commerce's determinations of cost of production and constructed value, respectively. Plaintiffs base their claim on the language of sections 773(b) and (e), relevant legislative history, judicial precedent and administrative practice. Defendant urges that these same sources support Commerce's conclusion that cost of production and constructed value should be calculated by using actual costs, rather than such theoretical costs.

### I. Scope of Review

■ Initially, the parties disagree about the amount of deference that this court should give to Commerce's remand determination. Although the parties agree that the proper standard of review is essentially one of reasonableness, they disagree about the level of scrutiny that the term "reasonable" requires.

Plaintiffs argue that the issue involved in this case is essentially one of law, over which the agency has no discernible expertise. They contend that this court, as the ultimate arbiter of statutory construction, should conduct a searching inquiry into the propriety of defendant's interpretation. *Chevron, U.S.A., Inc. v. National Resource Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). The defendant argues that its experience in regulating the antidumping act entitles it to special deference. *Zenith Radio Corp. v. United States*, 437 U.S. 443, 450–451, 98 S.Ct. 2441, 2445–46, 57 L.Ed.2d 337 (1978). Under defendant's proposed standard of review, *any* reasonable agency interpretation would be upheld by this court. *Chevron*, 467 U.S. at 845, 104 S.Ct. at 2783.

It is well established that the Secretary of Commerce has broad discretion in executing the antidumping laws. *Smith Corona Group v. United States*, 713 F.2d 1568, 1570 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Thus, agency interpretations in this area will normally be upheld if they are reasonable and do not contravene the plain language or purpose of the statute. This deference, however, should in no way be construed as a rubber stamp for the government's interpretation of statutory provisions. In the case at bar, there are convincing reasons to approach the government's determination with a heightened sense of scrutiny. Commerce has itself admitted that judicial precedent on the issue of subsidies is inconsistent. Furthermore, there has been no consistent administrative practice with respect to adding or subtracting subsidies from cost of production and constructed value calculations. Commerce's interpretation of section 773 was adopted only as a consequence of this action; thus, there has been no protracted reliance by the government or by private parties on the new policy regarding subsidies.

In a recent case, this court addressed the issue of judicial deference to agency interpretations and concluded:

The extent or degree to which the Court should defer to the agency is dependent upon a number of factors. As the Supreme Court explained in a leading case,

We consider that the rulings, inter-' pretations and opinions of the [administrative official], while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.

*Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). *Ceramica Regiomontana v. United States,* 10 CIT ——, 636 F.Supp. 961 (1986). In light of these standards, this court must perform a searching inquiry of Commerce's position to determine its reasonableness in light of the language of section 773 and its underlying legislative purpose.

## II. Legislative History

It is an established principle of jurisprudence that where a statute's meaning is clear, that meaning will be controlling, even if relevant legislative history suggests another plausible interpretation. *Tennessee-Valley Authority v. Hill,* 437 U.S. 153, 173, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978). Utilizing this principle, plaintiffs initially argue that Commerce's remand determination is contrary to law because it misconstrues the "unambiguous meaning" of sections 773(b) and (e). Specifically, plaintiffs contend that the language of these provisions referring to cost of production and constructed value must be interpreted to mean a producer's objective costs, including the costs covered by

subsidies, rather than the subjective costs, as reflected in the companies' books and records.[4] Although the language cited by plaintiffs clearly requires Commerce to consider a product's cost of production, it does not make clear *whose* costs are to be considered. Plaintiffs' argument merely begs the question of whether Commerce is required to consider subjective or objective costs.

Both parties have also supported their interpretations of section 773 by citing consistent related provisions in the antidumping statute. Plaintiffs argue that the appearance of statutory minima for profit and general expense calculations in section 773(e) demonstrates that Congress intended all cost terms to be defined objectively. Defendant points to 19 U.S.C. § 1677(16)(B)(i) (1982), which defines "such or similar merchandise" as "[m]erchandise produced in the same country and by the same person as the merchandise which is the subject of the investigation." Defendant argues that the statute's reference to the same producer demonstrates that costs were intended to be subjective.

■ These provisions do not address specifically the issue of subsidization, nor are they helpful in ascertaining which costs section 773 was intended to encompass. Since the terms of the statute are ambiguous, a discussion of relevant legislative history, case law, and administrative precedent is in order.

Both parties have cited a substantial body of legislative history to support their interpretations of sections 773(b) and (e). Yet, the vast majority of this material supports the parties' contentions only with the aid of strained reasoning.[5]

---

**4.** Section (b) requires the administrative authority to determine whether sales have been made "at less than the cost of producing the merchandise". Section (e) requires the calculation of constructed value based on the costs "which would ordinarily permit the production of that particular merchandise in the ordinary course of business."

**5.** For example, plaintiffs cite two passages in the legislative history to show that Congress

intended cost of production and constructed value to be based on the manufacturer's objective costs: a House of Representatives Report stating that section 773(b) was meant to cover the "cost of producing such merchandise" and "variable and fixed costs," and an earlier Senate report which declared that constructed value was not meant to be limited to the "actual cost of the imported merchandise." H.R.Rep. No. 571, 93d Cong., 1st Sess. 71 (1973); S.Rep. 16, 67th Cong., 1st Sess. 13 (1921). These scattered

The most persuasive legislative history referred to by plaintiffs concerns the policies underlying the amendment of section 321(d) (the predecessor to section 773(b)) in the Trade Act of 1974. The 1974 Act expanded the definition of dumping to include certain situations in which producers sell goods at a price below the cost of production in their domestic markets as well as abroad. Plaintiffs argue that businesses who sell below cost both at home and abroad generally survive only with the aid of government subsidies; thus, the 1974 amendments, in order to be effective, must have been enacted to permit the calculation of all objective costs. This claim is supported by evidence showing that, prior to the enactment of the 1974 Act, Congress was apprised of a case in which a subsidized producer of paper-making machinery was selling below cost at home and abroad, but no dumping finding was made. *See Trade Reform: Hearings on H.R. 6767 Before the House Ways & Means Committee*, 93d Cong., 1st Sess. 3083 (1973) (statement of Eugene L. Stewart). Plaintiffs contend that Congressional dissatisfaction with this case served as the primary impetus for the amendment.

██ It is important to note that the testimony about the case referred to above was not received during the hearings on the 1974 Act; nor do the House or Senate reports on the 1974 Act mention the case, or a comparable justification for the amendment of section 321. Considering the relative paucity of legislative history cited by plaintiffs, and its tenuous connection to the actual history of the 1974 Act, the defendant's interpretation of the Act cannot be viewed as unreasonable solely in light of this history.

### III. Judicial Precedent

In its remand results, Commerce concluded that judicial precedent in the antidump-ing area on the subsidies issue was divided and that Customs valuation cases were not proper authority for determining which costs should be factored in to calculate cost of production. Plaintiffs contend that defendant's interpretation of section 773 is unreasonable in light of all judicial precedent, and that Customs valuation cases do offer appropriate support for adding subsidies in cost of production and constructed value calculations.

Plaintiffs rely on two antidumping cases: *Connors Steel Co. v. United States*, 2 CIT 242, 527 F.Supp. 350 (1981) and *J.H. Cottman & Co. v. United States*, 20 CCPA 344, *cert. denied*, 289 U.S. 750, 53 S.Ct. 695, 77 L.Ed. 1495 (1932). In *Connors Steel*, this court rejected the plaintiff's argument that subsidization necessarily meant that a manufacturer's home market sales were below the cost of production. 527 F.Supp. at 358. However, in *dictum*, the court stated that "if the actual calculation of cost of production is reached, the relevant subsidies cannot be ignored." *Id.* Plaintiffs rely on this statement to support their argument that subsidies are to be treated as a component of cost of production.

It is difficult to view this statement as providing strong support for plaintiffs' position. In *Connors Steel*, this court was addressing an entirely different issue, the sufficiency of evidence necessary to require an investigation into a producer's cost of production. Furthermore, the language cited by plaintiffs does not specify *how* the court would treat subsidies in calculating cost of production.[6]

The *Cottman* case provides stronger support for the plaintiffs' position. In *Cottman*, the Court of Customs and Patent Appeals held that a materials cost for phosphate rock must be included in cost of production where the manufacturer was the Moroccan government, which had ob-

---

snippets in the history, especially an unexplained quote from the history of the prior law, do not clarify whether all objective costs or only the manufacturer's costs were intended to be covered.

**6.** In *dictum*, the *Connors Steel* court agreed with Commerce's position that, "if anything, subsidization would *lessen* the cost of production" (emphasis added). In the context of the entire case, it is not clear what result this implies.

tained the raw materials at no cost. The majority wrote, "[f]oreign-market value, in our opinion, as defined in this statute was intended by Congress to mean such conditions as exist in a free, open, unrestricted market, where people meet under normal competitive conditions to buy and sell their goods." 20 CCPA at 357. Plaintiffs analogize the Moroccan government's free distribution of phosphate rock to the government subsidies received by Saarstahl in the case at bar. Plaintiffs argue that only by including these subsidies in cost of production can Commerce comply with the *Cottman* court's policy of simulating free market conditions.

The support garnered by plaintiffs from the *Cottman* case is undermined by the Court of Customs and Patent Appeals decision in *European Trading Co. v. United States*, 27 CCPA 289 (1940), involving an antidumping order on entries of wire fish trap netting imported from Germany. The German seller of wire rods used to make the netting gave export rebates to the netting manufacturer, which were included by Treasury in calculating the cost of production of the wire. The CCPA disagreed with the government and held that the rebated amount should not be added into the cost of production. The court stated that the "foreign value" of the rods was not at issue, but rather the actual cost of production, as defined in the antidumping act. The court drew strong distinctions between the remedies available under the countervailing duty law and the remedies available under the antidumping law at issue.

*Cottman* should be given limited application for other reasons, as well. The *Cottman* court was faced with a situation which was difficult to deal with under prior law. As far as phosphate rock was concerned, Morocco acted as a non-market economy country. Prior antidumping law was not geared to such economies. Today, antidumping surrogate country provisions are applicable in non-market economy

cases. *See Chemical Products Corporation v. United States*, 10 CIT ——, 650 F.Supp. 178 (1986). Such provisions first appeared in the Trade Act of 1974. Trade Act of 1974, Pub. Law 93–618, § 321, 88 Stat. 2047 (1975). In market economy cases, countervailing duty remedies would now be available.[7] The legal, factual, and economic context of *Cottman* distinguishes it from this case.

Plaintiffs argue further that their position is supported by a customs valuation case in which cost of production was calculated on the basis of objective costs. *Ford Motor Co. v. United States*, 29 Cust.Ct. 553 (1952) (pattern equipment made by U.S. importer is properly added into cost of production of rough iron castings manufactured in and exported from Canada). In addition, see *Ravenna Mosaics v. United States*, 49 Treas.Dec. 699, T.D. 41503 (1926) (cost of preparing design sketches, which was paid by U.S. importer, was properly added into cost of production of mosaics exported to the U.S.).

These cases do not specifically address the issue of government subsidies, however; nor is it clear that customs valuation cases should always define "cost of production" as it is used in antidumping law. Citing a Senate report, plaintiffs argue that the term "cost of production" was changed to "constructed value" in the 1958 Trade Act in order to facilitate conformity between customs and trade cases. S.Rep. No. 1619, 85th Cong., 2d Sess. (1958), *reprinted in* 1958 *U.S.Code Cong. & Ad. News* 3499, 3505. Yet, this report merely announces that the term "constructed value" will be used in both areas of law; it does not associate the use of the term with a common policy of ascertaining objective value in all cases. Since the passage of the 1958 Act, Commerce has often refused to follow Customs valuation precedents where to do so would impede the specific policies of the antidumping law. *See, e.g., Tele-*

---

**7.** Apparently because phosphate was not subject to regular duties, additional countervailing duties could not be imposed under the law in existence at the time of *Cottman*. Tariff Act of 1922, ch. 356, title 3, § 303, 42 Stat. 935.

*vision Receiving Sets, Monochrome and Color, From Japan; Final Results of Administrative Review of Antidumping Finding,* 46 Fed.Reg. 30163 (1981) (stating that judicial decisions interpreting the phrase "freely offered" in the context of customs laws are irrelevant to interpreting the antidumping law).

Furthermore, one recent case demonstrates both the differing legal contexts in which these words must be applied and a somewhat subjective approach to calculating cost of production. In *M & M Mars Snackmaster v. United States,* 7 CIT 249, 587 F.Supp. 1075 (1984), this court held that for tariff purposes export rebates received after the time of manufacture should not be deducted from "cost of materials," but neither should they be added as additional profits, in calculating cost of production. The implication is that if the rebates had been received earlier they would have been *deducted* from the cost of materials figure. The court also noted the countervailing duty issue which was not before it. The judicial precedents cited by plaintiffs have failed to demonstrate that defendant's interpretation of sections 773(b) and (e) is unreasonable under existing case law.

### IV. Administrative Practice

Plaintiffs contend that past administrative practice mandates the inclusion of subsidies in cost of production and constructed value calculations. Specifically, plaintiffs cite two Commerce determinations in *Shop Towels of Cotton from The People's Republic of China,* 48 Fed.Reg. 37,055 (1983); 50 Fed.Reg. 26,020 (1985). In these antidumping cases Commerce looked to a surrogate country, Pakistan, to calculate foreign market value because China was found to possess a state-controlled-economy. Commerce concluded that Pakistan was an improper surrogate because its exports were subject to countervailing duty orders. 50 Fed.Reg. at 26,023.

Although the *Shop Towels* proceedings involved the interpretation of section 773(c), regarding state-controlled-economies, plaintiffs argue that the principle underlying these determinations is applicable to the case at bar. They contend that sections 773(c) and 773(b) were enacted concurrently to provide a reliable benchmark for foreign market value calculations. Since Commerce has concluded that potential surrogate economies are inappropriate for comparison purposes if they utilize subsidization, plaintiffs argue that subsidies must also be considered in section 773(b) calculations in order to achieve a consistent policy.

It is not clear why the practices governing the selection of surrogate economies should control the calculation of cost of production under section 773(b). Plaintiffs correctly note that under both provisions the failure to account for subsidies could lower the dumping margins calculated by Commerce. The failure to factor in subsidies, however, presents an irremediable problem only in state-controlled economy cases. Because there is no way to compensate for the selection of a defective measuring rod under the statute, it is essential to select surrogate economies unaffected by subsidization. *Cf. Chemical Products v. United States,* 10 CIT ——, 650 F.Supp. 178 (1986). It is not necessary to consider subsidies in section 773(b) cost of production calculations, however, because the effects of subsidization can be addressed in a countervailing duty proceeding. The proper scope of the antidumping remedy, and not an overriding policy of calculating objective costs, defines the parameters of section 773(b).

Defendant has cited several administrative rulings in the antidumping area in which it actually subtracted production costs absorbed by foreign governments in the form of grants. *Preliminary Determinations of Sales at Not Less Than Fair Value: Certain Steel Products from the Netherlands,* 47 Fed.Reg. 35664 (1982) (production costs absorbed by the government in the form of grants subtracted to calculate cost of production in order to avoid possible double counting of subsidies in concurrent antidumping and countervail-

ing duty investigations); *Red Raspberries from Canada; Final Determination of Sales at Less Than Fair Value,* 50 Fed. Reg. 19,768 (1985) (income from the Canadian government's Farm Insurance Income Program found unrelated to cost of production; wage rebate benefits subtracted as offsets to cost since such benefits were attributable directly to raspberry production). *See also, Certain Steel I–Beams from Belgium, Antidumping Determination of Sales at Not Less Than Fair Value,* 44 Fed.Reg. 54,579 (1979) (stating that to the extent a producer's production or sales are subsidized, its cost of production may be lessened).

In its brief, the defendant acknowledges that it is no longer Commerce's practice to deduct government subsidies from reported costs in calculating cost of production. In any case, the approach in these proceedings differs from the position taken here, that of reliance on the producers' costs as reflected in properly maintained books and records.[8] Thus, past administrative practice in antidumping cases supports neither side.

## V. The Relationship between Antidumping and Countervailing Duty Law

■ The sources discussed thus far, even if viewed in toto, are not clearly dispositive of the issues involved in this case. To further substantiate their interpretations of section 773, the parties have presented additional practical considerations regarding the implementation of the antidumping statute. These arguments

more clearly illustrate the propriety of defendant's interpretation.

Plaintiffs argue that the antidumping law cannot possibly operate properly if subsidies are ignored in the calculation of foreign market value. In the case of Saarstahl, plaintiffs estimate that loans and grants have resulted in a subsidy impact of 11 percent of the value of sales. Plaintiffs further contend that Commerce's interpretation of section 773 has allowed Saarstahl to evade antidumping penalties simply by utilizing favorable accounting procedures. Plaintiffs argue that if all foreign manufacturers are allowed to record subsidies as reduced acquisitions costs, rather than business receipts, the application of the antidumping law will be significantly curtailed.[9]

These arguments do not address the real question at issue: what is the scope of the antidumping law. Congress did not enact the antidumping statute to address all forms of interference in the international marketplace. Antidumping law seeks to counteract the comparative advantage held by foreign manufacturers who pursue inconsistent pricing policies in the international market in order to maximize their overall income. (Note that the domestic subsidies at issue presumably have the same result in both home and foreign markets.) The antidumping remedy protects domestic industry from imported merchandise sold at less than fair value, which imports either have caused or threaten to cause material injury. *Badger-Powhatan, Div. of Figgie Intern., Inc. v. United*

---

**8.** A House of Representatives report on the Trade Act of 1974 stated that, in calculating the cost of production, the Secretary will employ "accounting procedures generally accepted in the home market of exportation if he is satisfied that such principles reasonably reflect the variable and fixed costs of producing the merchandise." H.R.Rep. No. 571, 93d Cong., 1st Sess. 71 (1973).

**9.** Plaintiffs note that under the accounting laws of some nations, including West Germany, government grants may be treated as business receipts or used to reduce the cost of acquisition of a purchased asset. Plaintiffs contend that where grants are treated as business receipts in

company records, the accounting entries on which cost of production is based reflect the actual economic cost of production. Where grants are used to reduce the cost of acquisition of a purchased asset, however, plaintiffs argue that cost of production calculations can be distorted as follows. The cost of producing a commodity will turn, in part, on the spent value (i.e., depreciation) of capital that is used to produce the item. If Commerce calculates depreciation based on the cost of acquisition as reduced by subsidization, the amount of depreciation assigned to cost of production in a given period will not reflect the true value of capital consumed.

*States,* 9 CIT ——, 608 F.Supp. 653, 656–57 (1985). Countervailing duty law, in contrast, was enacted specifically to address the market distortions caused by subsidization. *Zenith Radio Corp. v. United States,* 437 U.S. 443, 455–56, 98 S.Ct. 2441, 2447–48, 57 L.Ed.2d 337 (1978). It is important to note that the amount of subsidies received by foreign manufacturers is not necessarily related to their disparate pricing practices at home and abroad. Subsidies can be applied to operations of an enterprise that do not have a direct impact on pricing, and prices can be raised or lowered regardless of the effects of subsidization. Thus, even if the impact of Saarstahl's subsidies was substantial and it avoided penalties solely through the election of favorable accounting procedures, plaintiffs' claim is still more properly addressed by countervailing duty law.

Defendant has persuasively argued that plaintiffs' reading of section 773 improperly blurs the distinction between antidumping and countervailing duty law. This court and its appellate court have long recognized the dangers of allowing these two areas of law to be commingled. See *supra* discussion of judical precedent. In a recent case this court stated,

> [T]here are further reasons the court and the ITA should refrain from making a subsidy determination in the context of a dumping investigation. The determination of whether a countervailable subsidy exists is a complex one and Congress has provided a separate set of guidelines for the inquiry. In a dumping investigation the ITA is not seeking the same information or asking the same questions it would in a countervailing duty investigation. For this Court to disallow an adjustment to third country price because the import duty rebate is allegedly a countervailable subsidy would be to bypass the countervailing duty statute and essentially penalize the Taiwanese exporters without allowing them an opportunity at the agency level to have a full hearing on whether the rebates are a subsidy.

*Huffy Corp. v. United States,* 10 CIT ——, 632 F.Supp. 50, 55–56 (1986).

Essentially, plaintiffs attack Saarstahl's accounting adjustment to fixed costs merely because the adjustment is based on subsidies. If plaintiffs' interpretation of section 773 prevailed in this case, Commerce would be allowed to counteract subsidization without undertaking any of the procedural protections contained in the countervailing duty statute. Under countervailing duty law a subsidy may result in the imposition of duties only if it falls within the term "subsidy" as defined in 19 U.S.C. § 1677(5) (1982). Furthermore, some government grants, such as those which are generally available, are not countervailable. *But see, Cabot Corporation v. United States,* 9 CIT ——, 620 F.Supp. 722 (1985), *appeal dismissed on other grounds,* 788 F.2d 1539 (Fed.Cir.1986). Plaintiffs' interpretation of section 773 dispenses with these inquiries and threatens to create a new body of law with different criteria for identifying and valuing subsidies. Benefits that were previously not countervailable could be attacked under new antidumping rules, thus creating substantial uncertainty among exporters.

Utilizing producers' records of cost of production, kept in accordance with generally accepted local accounting procedures, which procedures reasonably reflect fixed and variable costs, allows Commerce to administer the antidumping laws without undertaking an unauthorized countervailing duty investigation. For these reasons, this court cannot conclude that the defendant's construction of section 773 is unreasonable.