**BOMONT INDUSTRIES, Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Asahi Chemical Industry Co., Ltd., Intervenor–Defendant.**

**No. 86–05–00557.**

United States Court of International Trade.

June 30, 1989.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Charles A. St. Charles, Mary Tuck Staley and John M. Breen, Washington, D.C., for plaintiff.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Sheila N. Ziff (Douglas A. Riggs, Gen. Counsel, M. Jean Anderson, Chief Counsel for Intern. Trade, and William Perry, Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, D.C., of counsel), for defendant.

Barnes, Richardson & Colburn, James S. O'Kelly, Leonard Lehman and Matthew T. McGrath, New York City, for intervenor-defendant.

## OPINION AND ORDER

AQUILINO, Judge:

The plaintiff complains at length about the performance of the International Trade Administration, U.S. Department of Commerce ("ITA") in resolving a proceeding *sub nom. Antidumping; Nylon Impression Fabric From Japan; Final Determination of Sales at Not Less Than Fair Value*, 51 Fed.Reg. 15,816 (April 28, 1986), wherein the agency determined that imports of the indicated merchandise by or

**960**

for the account of Shirasaki Tape Co., Ltd. and Asahi Chemical Industry Company, Ltd. were not being, or likely to be, sold in the United States at less than fair value.

In 1977, the Treasury Department had determined that, with the exception of the merchandise supplied by Shirasaki and by Asahi, impression fabric of man-made fiber from Japan was being sold at less than fair value within the meaning of the Antidumping Act of 1921, as amended.[1] The weighted-average margin on Asahi's sales was considered *de minimis*, whereas Shirasaki was excluded from the finding of dumping [2] because the weighted-average margin on its sales was considered to be "minimal" in relation to their total volume, and "formal assurances" of no future sales at less than fair value were received. *See* 42 Fed. Reg. at 65,345.

Bomont Industries and a domestic competitor filed a petition with the ITA pursuant to the Trade Agreements Act of 1979, as amended by the Trade and Tariff Act of 1984, alleging dumping by Asahi and Shirasaki. The agency concluded that the petition contained sufficient grounds upon which to initiate an investigation of merchandise by or for the accounts of those two enterprises. After the International Trade Commission determined that there was reasonable indication that imports of nylon impression fabric from Japan were materially injuring the U.S. industry [3], the ITA investigated the period January 1 through June 30, 1985 and reached the final negative determination cited above.

Plaintiff's complaint pleads some 18 causes of action. Its motion for judgment on the agency record pursuant to CIT Rule 56.1 is spelled out in a 142-page brief and 61-page reply brief encompassing five fundamental claims, to wit: (1) the ITA's decision not to expand the period of investigation was unsupported by substantial evi-

dence and contrary to law; (2) the agency's failure to investigate sales of Japanese impression fabric transshipped through West Germany was an abuse of discretion and unsupported by substantial evidence of record; (3) the ITA failed to verify transfer prices between related parties and based its final determination of foreign-market value on related-party or fictitious prices contrary to the statute, regulations and agency precedent; (4) the ITA's determination was based on unverified and questionable information submitted by Shirasaki and thus was unsupported by substantial evidence; and (5) the agency abused its discretion by allowing Asahi and Shirasaki to submit public versions of their questionnaire responses that did not comply with the law.

Jurisdiction is based on subparagraphs (A)(i)(I) and (B)(ii) of 19 U.S.C. § 1516a(a)(2) (1984) and upon 28 U.S.C. § 1581(c).

## I

In response to plaintiff's primary point, the defendant states that

> Commerce has consistently taken the position that its normal practice is to conduct a six-month investigation and that it will not expand the investigation period without good cause.[4]

The petitioners recognized this fact, as revealed, for example, in experienced counsel's letter requesting a broader investigative period although admitting that an investigative period of January 1 through June 30, 1985 would conform with normal agency practice.[5] Nevertheless, the plaintiff in its present papers, as well as in prior proceedings in open court, has sought to show unfair treatment, "so fundamentally prejudicial as to constitute a deprivation of due process" [6], by the ITA.

1. *See Impression Fabric of Man–Made Fiber from Japan; Determination of Sales at Less Than Fair Value; Exclusion From and Final Discontinuance of Antidumping Investigation,* 42 Fed.Reg. 65,344 (Dec. 30, 1977).

2. *See* 43 Fed.Reg. 22,344 (May 25, 1978).

3. *See* 50 Fed.Reg. 31,053 (July 25, 1985).

4. Defendant's Memorandum, p. 32.

5. Record Document ("R.Doc") 10 at 1.

6. Plaintiff's Brief, p. 71 (quoting *Lois Jeans & Jackets, U.S.A., Inc. v. United States,* 5 CIT 238, 243, 566 F.Supp. 1523, 1528 (1983)).

Of course, in an action such as this, challenging a final negative determination, the standard of review prescribed in the 1979 act, as amended, is whether the agency decision is unsupported by substantial evidence on the record, or otherwise not in accordance with law. The standard set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), for holding agency action unlawful as arbitrary, capricious and an abuse of discretion does not apply here. *Compare* 19 U.S.C. § 1516a(b)(1)(B) *with id.*, § 1516a(b)(1)(A). Nevertheless, the plaintiff correctly argues that parties are entitled to some degree of due process from agencies, consonant with the rights affected and type of proceeding involved, citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), and *Goldberg v. Kelly*, 397 U.S. 254, 267–71, 90 S.Ct. 1011, 1020–22, 25 L.Ed.2d 287 (1970).

The petition below was filed on June 10, 1985, which led to the ITA's conducting an investigation for the period January 1 through June 30th of that year in accordance with 19 C.F.R. § 353.38(a), which provides, in part:

... Ordinarily the Secretary will require a foreign manufacturer, producer, or exporter subject to the investigation to submit pricing information covering a period of at least 150 days prior to, and 30 days after, the first day of the month during which the petition was received in acceptable form.

This regulation also states that the Secretary

may, however, require the submission of pricing information for such other period as he deems necessary and he may also require the submission of pricing information on a current basis during the course of an investigation.

At the outset of the investigation, in commenting on the agency's draft questionnaire, the petitioners requested that the ITA "obtain information for a longer period of time—specifically 12 months, July 1, 1984 through June 30, 1985." R.Doc 10 at 2. In support of this position, they referred to

their belief that the Japanese producers and exporters have taken temporary steps to minimize the dumping taking place. As recognized ... in the injury investigation before the International Trade Commission, imports of the product under the investigation have decreased in the first quarter of 1985.... This recent decline has occurred even though imports from 1981 through 1984 increased steadily. The decline in imports in the first quarter of 1985 supports petitioners' belief that the Japanese producers were aware of the impending filing of an antidumping petition, and so changed some of their practices. Thus, the agency should investigate an entire year to ensure that the information provided is truly representative of Japanese sales of nylon impression fabric. R.Doc 17 at 2.

Thereafter, during the course of the investigation, the petitioners called upon the ITA to "require current price information [for] the period August 24, 1985 through February 24, 1986 (or September 1, 1985 through February 28, 1986, whichever is easier administratively)." R.Docs 137, 139. In other words, a period past the time actually covered in accordance with agency practice and the above regulation should be investigated. The ITA disagreed.

It is this more recent (rather than the earlier) proposed period of time which is now the focus of plaintiff's complaint. Its reply brief underscores (at page 5) its contention that

all of the evidence in the record supports the conclusion that Japanese nylon impression fabric was sold at LTFV by the end of 1985. Not even a scintilla of evidence in the record has been identified either by the ITA or Asahi to support the ITA's refusal to investigate beyond June 1985.

In response to this contention, the defendant relies initially on the language of 19 U.S.C. § 1673(1), pursuant to which an antidumping duty can be imposed if "foreign merchandise is being, or is likely to be, sold in the United States at less than fair value." The significance of the disjunctive, in

the view of the defendant, is stated to be as follows:

> ... [T]he statute speaks in the alternative, *i.e.*, Commerce may determine that sales at LTFV have occurred, or it may determine that such sales are likely to occur. There is no requirement that it do both. Under prevailing practice in LTFV investigations, Commerce examines the likelihood of sales at LTFV only where no sales have been made or reported during the period of investigation.[7]

Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979). Here, the context is foreign merchandise sold in the United States at less than fair value. The above auxiliary verbs connected by "or" simply set the tenses, not the substance, of the statute. And even if the act were drawn to differentiate in a substantive way one time from the other[8], the antidumping law is remedial, not punitive[9], and remedial statutes are to be construed liberally. *See, e.g.*, 3 Sutherland Stat. Const. § 60.01 (4th rev. ed. 1986) and cases cited therein. In short, the foregoing view of the defendant is too restrictive a reading of the law it is obligated to enforce.[10] While the ITA has broad discretion in enforcement of that law, and its expertise is entitled to deference, it is not at liberty to disregard the statute's plain meaning. *Washington Red Raspberry Commission*

*v. United States*, 11 CIT ——, ——, 657 F.Supp. 537, 541 (1987) (citing *Al Tech Specialty Steel Corp. v. United States*, 10 CIT 743, 745–46, 651 F.Supp. 1421, 1424–25 (1986)), *aff'd*, 859 F.2d 898 (Fed.Cir.1988).

The issue is thus whether defendant's restrictive reading requires remand for reconsideration. On the record at hand, the court concludes that it does not. *Toho Titanium Company, Ltd. v. United States*, 11 CIT ——, ——, 657 F.Supp. 1280, 1285 (1987), held that, in

> evaluating Commerce's practice pursuant to [19 C.F.R. § 353.38(a)], the Court must look at each case independently to assess whether the evidence produced during the investigation provides substantial evidence on the record to support the determinations required by statute

and also that choice of a six-month period for investigation "does not mean that data [there] from ... is insubstantial evidence on the record to support Commerce's determinations." 11 CIT at ——, 657 F.Supp. at 1284. Indeed, here the plaintiff virtually concedes that substantial evidence exists, indicating the absence of sales at less than fair value for the period investigated and of the likelihood of such sales based thereon[11], hence the plea below (and now) that other periods be considered by the ITA. The agency could have done so, but its decision not to follow-up the petitioners' leads was in accordance with law. *See* 19 C.F.R. § 353.38(a); *Toho Titanium Company, Ltd. v. United States*, 11 CIT at ——, 657 F.Supp. at 1285 (the regulation "gives the Secretary discretion to collect

---

7. Defendant's Memorandum, p. 13. In response to the petitioners' comment (22) that the ITA should expand the period of investigation to determine the likelihood of sales at less than fair value, the agency itself took the position, in part:
> ... During the past investigation on nylon impression fabric from Japan, the respondents Asahi and Shirasaki were specifically excluded because their margins were *de minimis* or minimal. Thus, the evidence is contrary to petitioners' allegation of a likelihood of sales at less than fair value. 51 Fed.Reg. at 15,818.

8. *Cf. e.g.*, H. Weihofen, Legal Writing Style, pp. 95–96 (2nd ed. 1980) ("Distinguish Between the Conjunctive and the Disjunctive").

9. *Badger–Powhatan, A Div. of Figgie Int'l, Inc. v. United States*, 9 CIT 213, 216, 608 F.Supp. 653, 656 (1985).

10. *Cf.* Intervenor Asahi Chemical Industry Co., Ltd.'s Brief in Opposition to Plaintiff Bomont Industries' Motion for Judgment on the Agency Record ("Asahi Brief"), p. 11 ("Th[e] language [of the statute] obviously contemplates findings about either actual pricing behavior, or projected pricing behavior, based on information derived from the specified period of investigation").

11. *See generally* Plaintiff's Reply Brief, pp. 1–15.

sales and cost information for a longer or shorter period of time as he deems necessary").

While the record reveals considerable independent effort on the part of the petitioners to provide information about the domestic and foreign marketplaces, both before and after commencement of the administrative proceedings, the timing thereof rested, of course, with them. That their choice of moment did not lead to desired determination(s) of dumping is not now a basis for judicial extension of the governing law as to investigation time-frame. Indeed, the plaintiff does not cite a case requiring such a result[12], nor has this court discovered any. This is not to imply, however, that administrative extension of the period of investigation would have been inappropriate, in the light of the information brought to the ITA's attention and the letter and the spirit of the antidumping law, only that the petitioners were afforded that degree of due process minimally required in consonance with the rights affected and type of proceeding involved.

## II

■ Part II of the petition set forth at length "information concerning nylon impression fabric produced by or for Asahi or sold by Shirasaki transshipped through Canada and West Germany to the United States". R.Doc 1 at 49, para. 1. *See generally id.*, pp. 49–85. In the notice of initiation of its investigation, the ITA referred specifically to the allegations of transshipment in finding that the petition met the requirements of 19 U.S.C. § 1673a. *See* 50 Fed.Reg. at 28,112. Apparently, during the course of the ensuing proceedings, the petitioners pressed the ITA to investigate the alleged transshipments for

sales at less than fair value. The agency's stated, final position on this point is as follows:

We disagree. Counsel for petitioners did not provide substantiation of any kind that imports of linked nylon impression fabric from West Germany originated in Japan. To the contrary, we verified that Shirasaki did not export any of this product to West Germany. Asahi, in its response, provided affidavits from the West German importer and its purchasers, two companies which ink and distribute the Asahi merchandise, that the Japanese fabric is inked and resold to the ultimate user in Europe. Further, this investigation, as requested in the petition, covers only uninked nylon impression fabric. There were no imports of this product from West Germany during the period of investigation. 51 Fed.Reg. at 15,819.

Counsel for the defendant now admit that the foregoing assertion of no imports of this product from West Germany during the period of investigation was in error, but they argue that

it is clear from the record that the agency meant to say that there were no *transshipped* imports of uninked impression fabric from West Germany.[13]

The intervenor-defendant argues that the ITA Report of Investigation of Asahi in Osaka, Japan

clearly indicates at page 5 that the Department verified reported sales to West Germany during the period of investigation as set forth in Asahi's questionnaire answer. The fact that the verification report did not refer specifically to "transshipments" does not indicate that the Department failed to verify Asahi's sales to third country markets.[14]

---

**12.** The plaintiff does attempt to rely on *Freeport Minerals Company v. United States*, 776 F.2d 1029 (Fed.Cir.1985). However, that case focused on an ITA determination to revoke an outstanding antidumping-duty order based on data years out of date at the time of the determination. In such a circumstance, the court of appeals held the ITA had abused its discretion

by neglecting to review current data. The situation is hardly comparable in this action. *Cf. PPG Industries, Inc. v. United States*, 12 CIT ——, 702 F.Supp. 914 (1988).

**13.** Defendant's Memorandum, p. 35 (emphasis in original).

**14.** Asahi Brief, p. 37.

But the affidavits provided by Asahi[15] and apparently relied on by the ITA do not prove the contrary either; they do not add up to the verification contemplated by the statute. At the time of the proceedings below, 19 U.S.C. § 1677e(a) required the ITA to "verify all information relied upon in making (1) a final determination in an investigation"[16]. That is, the obligation to verify rests with the administering authority, and not with the private parties before it. Any implication that the petitioners had the burden of substantiation is off the mark once, as here, the ITA had found the information presented in the petition adequate grounds for investigation. As stated in *The Budd Company v. United States*, 1 CIT 67, 72, 507 F.Supp. 997, 1001 (1980), the provisions of the Trade Agreements Act of 1979 clearly express congressional intent that the administrative agency will obtain information through its own investigative efforts. *Cf. Freeport Minerals Company v. United States*, 776 F.2d at 1033.

To the extent counsel are now attempting to justify the ITA's failure to verify on its own the allegations of transshipment, this court cannot accept such *post hoc* rationalization for the absence of required agency action. *See, e.g., Federal Power Commission v. Texaco*, 417 U.S. 380, 397, 94 S.Ct. 2315, 2326, 41 L.Ed.2d 141 (1974). Rather, the issue must be remanded for direct verification by the ITA, one way or the other.

### III

■ The record reveals that Asahi and a company by the name of Seiren were related parties within the meaning of 19 U.S.C. § 1677b(e)(3)(E) (1984) in view of the former's holding more than five percent of the stock of the latter. The record also shows that Asahi delivered its nylon fabric unslit to Seiren for finishing, which consisted of scouring and heat-setting. Upon completion of that process, Asahi sold the merchandise to independent trading companies.

When destined for the United States, the finished goods were delivered to the trading companies directly from Seiren, which slit the fabric for them.

The ITA's final determination states that the

Department conducted an extensive verification of Asahi and its sales practices. We verified from Asahi's books and records that Asahi sells only unslit material and only to the trading companies. We found that Seiren was recovering its costs in its finishing operations for Asahi. Furthermore, since Asahi accounts for only a very small fraction of Seiren's business, we found no relationship between Seiren's losses and prices charged to Asahi for finishing the fabric. 51 Fed.Reg. at 15,817.

The plaintiff claims the agency "failed 'to collect pertinent data or to consider ...' whether the price between Asahi and the unrelated trading company was a fictitious price designed to avoid the antidumping duty law." Plaintiff's Reply Brief, p. 47. Or, stated another way:

... Because the "unrelated" trading companies were dealing on the one hand with Asahi and on the other hand with Seiren (related parties), Bomont's repeated concern was that a "fictitious" sale has been inserted in the middle of an otherwise straightforward related-party transaction solely to avoid the dumping law. *Id.* at 48.

After review of the record, including ConfDoc 19 and attachments, the court concludes that it contains sufficient, substantial evidence to allay the stated concern that sales between Asahi and the trading companies were fictitious and aimed at undermining U.S. antidumping law. That law provides that, whenever the administering authority has "reasonable grounds" to suspect sales at prices which represent less than the cost of production, it shall investigate further and shall disregard them if the suspicion is substantiated. 19 U.S.C.

---

**15.** *See* Confidential Document ("ConfDoc") 5, Annex 5.

**16.** This requirement has been relettered subsection (b) per Pub.L. 100–418, § 1331, 102 Stat. 1204, 1207 (1988).

§ 1677b(b). This court is unable to find fault with the ITA's failure to equate the Asahi dealings with, and relationship to, Seiren reflected in the record with such requisite "reasonable grounds". That is, plaintiff's position that the agency should have gone further in investigating Asahi is not compelling.[17] On the other hand, if sales below the cost of production had been uncovered (over an extended period of time and in substantial quantities, thereby invoking constructed value per 19 U.S.C. § 1677b(b) and (e)), the ITA would have had discretion not to disregard the transactions involving Seiren under subsection (e)(2) of section 1677b. The fact that parties are related is not ground to disregard automatically transactions between them.

## IV

■ In regard to Shirasaki, the plaintiff complains that the ITA erroneously relied on product-specific general, selling, and administrative expenses rather than such expenses for the entire company in determining foreign market value. In its final determination, the agency had stated that it did not "believe the company-wide GS & A percentage is appropriate for NIF sold to unrelated home market customers." 51 Fed.Reg. at 15,818.

The disagreement revolves around the fact that company-wide expenses were found to be "significantly higher"[18] than those attributed to the nylon impression fabric sold in the home market and also around the existence of agency precedent relying on total company GS & A expenses. However, not even the plaintiff argues that the controlling statute requires the ITA to

follow such an approach in every case, only that not to do so is "inherently suspect". Plaintiff's Brief, p. 116.

Be that view as it may, the record supports the approach of the agency herein. It shows that most Shirasaki sales were for export, that those sales entailed the existence of a branch office, and that the expenses of that office were documented separately in the company's books. Hence, it was possible and appropriate to segregate those unrelated expenses from home-market-sale general expenses.

Some of Shirasaki's product during the period of investigation was characterized as "computer trim" or "second quality". The petitioners below argued that

> the proper method for accounting for sales of waste or second quality products is to deduct the sales revenue of a by-product from the total cost of producing all products and determine the cost of production of the primary products by dividing the remaining production costs by only the net yield of the primary product.[19]

Notwithstanding claims that the ITA had followed this approach in other proceedings, the agency declined to do so in the matter now at bar, stating:

> Shirasaki did not produce by-products. Additionally, its method of accounting for second quality product was used for the final determination because it adequately accounts for the cost of such products. 51 Fed.Reg. at 15,818.

This position has sufficient support in the record. To begin with, the second qual-

---

**17.** Plaintiff's two specific claims are that the ITA failed to verify (1) that the "Asahi-to trading company-to-Seiren transaction was not fictitious" [Plaintiff's Reply Brief, p. 48 (emphasis deleted) ] and (2) that "Seiren was recovering its costs in its finishing operations for Asahi." *Id.* at 50 (emphasis deleted). As to the first contention, the record amply supports the thesis that the only sales involved were to the unrelated trading companies, and not to Seiren. As for the second, information in the record indicates that the amount paid by Asahi to Seiren for packing and transportation of the merchandise, for example, exceeded the latter's cost therefor. *Compare* ConfDoc 19 at 7 with *id.* at 8. Moreover, while Seiren reported an overall net loss,

the record does not indicate other costs incurred by Seiren at Asahi's behest contributed in any material way thereto.

**18.** R.Doc 97 at 1 (001953).

**19.** Plaintiff's Brief, pp. 117–18, citing A. Matz & M. Usry, Cost Accounting Planning and Control (6th ed. 1976); F. Kollaritsch, Cost Systems for Planning, Decisions, and Controls Concepts and Techniques (1979); G. Crowingshield & K. Gorman, Cost Accounting (3d ed. 1974); J. Dearden, Cost Accounting and Financial Control Systems (1973).

ity product was sold to the U.S. market, albeit for different application, but still within the realm of nylon impression fabric. Secondly, Shirasaki apparently discounted the production yields for the lesser product by an amount equal to its sales discount in determining cost of production. *See* R.Doc 163 at 25–26.[20] While this approach does not appear to have been verified, as the plaintiff points out, the court concludes that any resultant error was harmless since the third, and most compelling, fact in the record is that the computer trim sales were "insignificant" during the period of investigation. ConfDocs 16 and 28 at 6. Thus, this court is not convinced that application of plaintiff's preferred methodology, quoted above, would lead to a material difference in the final determination.

Finally, the plaintiff contends that Shirasaki's cost-of-production information contained inconsistencies that were not examined or verified by the ITA. Suffice it to state that the court has reviewed the entire report in the record of the verification of Shirasaki's cost of production (ConfDoc 28) and concludes that it fulfills the expectations of the controlling statute.

## V

■ In its concluding point, the plaintiff states that it is "strongly opposed to unprincipled agency action, ignoring the statute, and adopting uncritically the claims of respondents." Plaintiff's Reply Brief, p. 60. Attention is directed at 19 U.S.C. § 1677f(b)(1)(A) (1984), which provided that the ITA require that information for which confidential treatment is requested be accompanied by either

(i) a nonconfidential summary in sufficient detail to permit a reasonable understanding of the substance of the information submitted in confidence, or

(ii) a statement that the information is not susceptible to summary accompanied by a statement of the reasons in support of the contention.

When the petitioners complained below that the foregoing provisions had not been adhered to adequately, the ITA agreed, in part, stating that the nonconfidential questionnaire reponses, "as submitted, do not comply with the nonconfidential summary provisions of the Tariff Act of 1930, as amended by the Tariff and Trade Act of 1984." R.Doc 54, p. 1. The agency went on to report, however, that acceptable explanations for the noncompliance had been received from the respondents. And it abides by this report and analysis now. *See* Defendant's Memorandum, p. 54.

Whatever the merits of the varying viewpoints at that moment in the administrative proceedings, the court cannot conclude now that those proceedings amounted, in the end, to denial of that degree of due process minimally required.

## VI

While plaintiff's thorough presentation in support of its motion for judgment on the agency record has exposed less-than-perfect proceedings below, with the exception discussed in Point II above, they were in accordance with law and supported by substantial evidence. On the motion, remand for further administrative action is required only in regard to the alleged transshipments discussed in that Point. The ITA may have 45 days from now for further proceedings not inconsistent with that discussion and to file any determination of the issue. The plaintiff may have 15 days thereafter in which to respond, and the defendant and the intervenor-defendant may have ten days to reply thereto. Otherwise, plaintiff's motion for judgment on the

---

**20.** *See also Ipsco, Inc. v. United States,* 13 CIT ——, 714 F.Supp. 1211 (1989), citing with approval (at 1214) C. Horngren, Cost Accounting: A Managerial Emphasis (5th ed. 1982) to the effect that "there are a number of methods for allocating costs between joint products, the most common of which 'allocate in proportion to some measure of the relative revenue-generating power identifiable with the individual products'" and also citing *Chemical Products Corp. v. United States,* 10 CIT 626, 645 F.Supp. 289, *remand order vacated,* 10 CIT 819, 651 F.Supp. 1449 (1986), to the effect that the "ITA's failure to take into account the disparate values of two products yielded by the same production process when allocating factors of production between them" was "unreasonable and not in accordance with law". *Id.* at 1215.

agency record must be, and it hereby is, denied.

So ordered.